**METROPOLITAN LIFE INSURANCE COMPANY, Appellee,**

v.

**TOMCHIK, Appellant.**

[Cite as *Metro. Life Ins. Co. v. Tomchik* (1999), 134 Ohio App.3d 765.]

Court of Appeals of Ohio,
Seventh District, Columbiana County.

No. 98–CO–22.

Decided Sept. 20, 1999.

766

768

*C. Scott Lanz,* for appellee.

*Allen Schulman, Jr.,* for appellant.

GENE DONOFRIO, Judge.

Defendant-appellant, David Tomchik, appeals the decision of the Columbiana County Court of Common Pleas finding in favor of plaintiff-appellee, Metropolitan Life Insurance Company ("MetLife"), in its declaratory judgment action.

On January 16, 1994, appellant, a licensed podiatrist, amputated his thumb while operating a band saw at his home. Appellant filed claims with his disability insurers, New York Life Insurance Company, and appellee, MetLife. MetLife denied appellant's claim and on September 21, 1994 filed a declaratory judgment action in the Columbiana County Court of Common Pleas. On August 25, 1995 New York Life filed its own complaint in the same court. At issue in both cases was whether appellant had intentionally amputated his thumb.

The declaratory judgment actions filed by New York Life and MetLife both sought a declaration that appellant was not entitled to benefits under any of the policies issued. In response, appellant filed a counterclaim for bad faith against MetLife, but not against New York Life. On February 12, 1996, appellant filed a motion to consolidate the two cases.

In order to facilitate the consolidation, appellant voluntarily dismissed the bad faith claim against MetLife. Thereafter, appellant sought to file amended counterclaims in bad faith against both MetLife and New York Life. The trial court denied appellant's request, ruling that appellant had preserved his right to file the claims at a subsequent date should he prevail at trial.

A jury trial commenced on June 23, 1997. Subsequently, New York Life moved for a mistrial, which motion was granted on July 1, 1997. Following the mistrial, on August 27, 1997, the two cases were bifurcated. The MetLife case was set for jury trial commencing on March 2, 1998. At the conclusion of the trial, on March 18, 1998, in response to a submitted interrogatory, the jury found that appellant had intentionally severed his right thumb and returned a verdict in favor of MetLife. On April 2, 1998, appellant filed a notice of appeal from this decision.

Appellant brings nine assignments of error, the first of which states:

"The trial court abused its discretion in denying Dr. Tomchik's motion for *voir dire* of MetLife's expert witness, Frank Lurwig, by requiring Dr. Tomchik to disprove the qualifications of MetLife's expert witness rather than requiring MetLife to prove the witness' qualifications, by qualifying Lurwig as an expert and permitting him to give opinion testimony based upon a reasonable degree of certainty in the fields of forensic engineering, accident reconstruction and wood science, and by overruling Dr. Tomchik's Motion to Strike Lurwig's testimony."

Appellant argues that the trial court permitted Frank Lurwig to testify as an expert witness without permitting appellant an opportunity to challenge Lurwig's credentials. Appellant notes that prior to Lurwig's testimony, appellant moved to conduct voir dire questioning on Lurwig's qualifications as an expert, which motion was denied by the trial court.

In addition, appellant claims that a trial court must require some proof that a proposed expert's opinions are based upon the knowledge and experience of his or her discipline, and the burden of establishing this is placed upon the party seeking to introduce the testimony (citing *Daubert v. Dow Pharmaceuticals, Inc.* [1993], 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469). Appellant argues that in the instant case, the trial court reversed the burden of proof, requiring appellant to demonstrate why Lurwig was not qualified to testify.

Appellant also argues that pursuant to *Daubert, supra*, the trial court was required to exercise control over Lurwig's testimony to insure that he did not testify beyond the scope of his expertise. Appellant notes that the trial court qualified Lurwig as an expert in his field without stating what that field was. Appellant concedes that Lurwig was qualified to testify as an expert in agricultural engineering and the design of agricultural tools, and, as an amateur wood worker, could offer limited testimony as to the operation of band saws. However, appellant claims that the trial court placed no limits on Lurwig's testimony, permitting him to testify on matters far beyond the scope of his expertise, which testimony misled the jury.

Specifically, appellant points to a portion of the transcript where Lurwig was permitted to testify as to whether the physical evidence introduced was consistent with appellant's claim that his hand had slipped while operating the band saw. Appellant argues that this testimony would have required expertise in forensic engineering, accident reconstruction, and wood science, all of which were beyond the expertise of Lurwig. Appellant argues that Lurwig's experience using band saws for many years did not qualify him to offer an expert opinion on the cause of appellant's accident.

In response, MetLife first notes that the trial court did not qualify Lurwig as a saw expert based solely upon his status as an amateur woodworker, but also considered Lurwig's considerable qualifications and prior experience as an engineer and product safety and design consultant. In addition, MetLife notes that Lurwig did not testify beyond the scope of his expertise, nor did he give an opinion on the ultimate issue in the case, *viz.*, whether appellant had intentionally severed his thumb.

Rather, MetLife notes that Lurwig testified concerning the basic features and operation of the band saw in question, the safety features of band saws in general, and how band saws operate as compared to other types of saws. In addition, in response to appellant's claim that he had slipped while cutting a piece of wood, Lurwig testified that the piece of wood in question did not indicate that any sudden movement had occurred during the cutting. Lurwig based this opinion on the "kerf marks" or blade marks on the wood, which appeared uniform, suggesting the blade had passed through the wood at a uniform speed. Hence, MetLife argues that Lurwig simply testified that in his opinion, the marks on the piece of wood were inconsistent with appellant's version of the events.

Lurwig also testified that the straightness of the cut was inconsistent with appellant's claim that he had released the board as he slipped. Appellee claims that Lurwig did not testify as to how the accident occurred, but rather, rendered an opinion that the piece of wood appellant claimed to have been cutting at the time of the accident did not show any evidence to confirm that amputation had occurred in the manner claimed by appellant. MetLife argues that this testimony was based on reliable, technical, and specialized knowledge, including Lurwig's experience as a design engineer for the company that manufactured the saw in question, and that the trial court did not abuse its discretion in permitting such testimony.

With respect to the trial court's failure to permit appellant to conduct voir dire on Lurwig, MetLife notes that Lurwig's report and curriculum vitae were provided to appellant on May 19, 1997, but that appellant chose not to conduct discovery of the witness. Nor did appellant file a pretrial motion *in limine* to exclude Lurwig's testimony, but rather, he waited until the witness was called

before objecting. MetLife notes that the trial court has broad discretion to control the mode and order of witness examination, and that this discretion was not abused by refusing to permit a voir dire at trial where appellant had made no efforts to conduct discovery on the witness or to depose him prior to trial.

In addition, contrary to appellant's contention, MetLife claims that the burden of establishing Lurwig as an expert remained with itself, and that this burden was met by its counsel through questioning designed to qualify the witness. MetLife argues that appellant was not required to show why Lurwig was not an expert, but, rather, was asked by the trial court for the basis of appellant's objection to Lurwig's qualifications as an expert. Finally, MetLife claims that any error in declining to permit a voir dire examination was harmless error as appellant conducted a lengthy cross-examination of Lurwig regarding his qualifications, and because the record nonetheless indicates that Lurwig was qualified as an expert based on his background, education, and experience.

Evid.R. 702 states:

"A witness may testify as an expert if all of the following apply:

"(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

"(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

"(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:

"(1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;

"(2) The design of the procedure, test, or experiment reliably implements the theory;

"(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result."

In addition, Evid.R. 104(A) provides as follows:

"Preliminary questions concerning the qualification of a person to be a witness * * * or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (B). In making its determination it is not bound by the rules of evidence except those with respect to privileges."

■ A witness may testify as an expert if the witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony. Evid.R. 702(B). While Evid.R. 702 permits expert testimony, a threshold determination must first be made under Evid.R. 104(A) concerning the qualifications of an individual to testify as an expert witness. *Vinci v. Ceraolo* (1992), 79 Ohio App.3d 640, 645–646, 607 N.E.2d 1079, 1082–1083. In determining the admissibility of an expert witness's testimony, the court must consider whether the witness will aid the trier of fact in its search for the truth. *Alexander v. Mt. Carmel Med. Ctr.* (1978), 56 Ohio St.2d 155, 159, 10 O.O.3d 332, 334, 383 N.E.2d 564, 566–567. The determination of whether a witness possesses the qualifications necessary to allow his expert testimony lies within the sound discretion of the trial court. *State v. Clark* (1995), 101 Ohio App.3d 389, 411, 655 N.E.2d 795, 808–809.

■ Prior to Lurwig being called to testify, appellant moved the trial court to permit a voir dire examination of the witness. Specifically, appellant argued that the qualifications of Lurwig did not meet the standards required for expert witnesses. The exchange between counsel for appellant and the trial court was as follows:

"MR. SCHULMAN [counsel for appellant] * * * The Ohio rules require that an expert have testimony that is outside the ability of a juror to understand the issues in the case. Looking at this man's report, looking at his resume, his qualifications, this man is offering, this man is a woodworker, he's simply coming in saying, 'I've done some woodworking, and therefore, I'm an expert and this is what happened.'

"He's not a forensic pathologist, he is not an engineer, he is not a physicist, he simply is a man that worked for a company that builds farm equipment.

"Well, I think the court should hear this man's qualifications before he comes in and starts throwing around opinions which this jury can clearly understand from the evidence.

"THE COURT: Well, I've heard enough. This case you know is the oldest case on my docket, it's been on the docket before. It's proceeded through six days of trial before, there's been plenty of opportunity for Counsel to not only take a discovery deposition of the witness and to file pre-trial motions challenging the witness' abilities.

"I don't think the time of trial, a trial that's already been indicated to be a lengthy trial, is the appropriate time to voir dire a witness on that matter.

"So, I'm going to allow the proceedings and I guess we'll determine whether he's an expert or not when we get to the appropriate question that he asks.

"MR. LANZ [counsel for MetLife]: Thank you, your Honor."

Lurwig was then sworn in and testified concerning his qualifications. Lurwig testified that he was then employed as a product safety and design consultant, and had been since 1995. Between 1992 and 1995, Lurwig had been the manager of product design and development for Brush–Hog, a division of Allied Products. In addition, Lurwig testified to having been a product safety engineer for Emerson Electric Company in the design and development of stationary power tools, including radial arm saws, table saws, joiner-planers and band saws. He had also been involved in the design and development of saws marketed under the Sears Craftsman brand name. While at Emerson, Lurwig had been personally involved in the development of the type of band saw that resulted in appellant's injury.

Lurwig testified that he had earned a Bachelor of Science degree in agricultural engineering from Auburn University and that he had previously testified in the Columbiana County Court of Common Pleas as an expert on saw injuries and the operation of saws. Finally, Lurwig testified that woodworking was a hobby of his, and that he owned a number of saws, including a band saw.

At the conclusion of this testimony, the following occurred:

"MR. LANZ: Your Honor, may we consider this witness to be qualified as an expert?

"THE COURT: Within his field.

"MR. LANZ: Thank you.

"MR. SCHULMAN: Objection, please.

"THE COURT: Overruled."

Appellant's contention that the basis for Lurwig's testimony was his status as an amateur woodworker is not supported by the record. Rather, the record indicates that Lurwig had a wealth of education and experience in the design and development of stationary power tools, including the band saw at issue in this case. Although the preferred procedure would have been to permit counsel for appellant to cross-examine the witness concerning his qualifications by means of a voir dire examination prior to the witness giving his opinions, any error in not doing so is harmless error, given the substantial qualifications of Lurwig, and the fact that counsel for appellant conducted a vigorous cross-examination concerning those qualifications.

Nor does the record support appellant's contention that the trial court switched the burdens by requiring appellant to prove that Lurwig was not an expert. The burden was clearly on MetLife to qualify Lurwig as an expert, which burden was sufficiently met.

Once qualified, an expert witness may give an opinion only as to matters within his or her expertise. *State v. Hopfer* (1996), 112 Ohio App.3d 521, 559, 679 N.E.2d 321, 345–346. Appellant claims that Lurwig was permitted to testify beyond his area of expertise, and to offer opinions that required expertise in forensic engineering, accident reconstruction, and wood science. A review of the record, however, indicates that the essence of Lurwig's testimony was that the kerf marks and the cut on the board appellant claimed to be cutting at the time of the amputation were inconsistent with appellant's description of how the injury had occurred. This testimony was within the realm of Lurwig's expertise, both as a product design and safety engineer, and as an amateur wood worker. To qualify as an expert, the witness need not be the best witness on the subject. *Scott v. Yates* (1994), 71 Ohio St.3d 219, 221, 643 N.E.2d 105, 106–107. Rather, the expert must demonstrate some knowledge on the particular subject superior to that possessed by an ordinary juror. *Id.* Accordingly, Lurwig's testimony was well within the scope of his expertise.

Appellant's first assignment of error is without merit.

Appellant's second assignment of error states:

"The trial court abused its discretion in denying Dr. Tomchik's motion for *voir dire* of MetLife's expert witness, Frank Lurwig, regarding his out-of-court experiment recreating Dr. Tomchik's accident and in permitting Lurwig to testify regarding an out-of-court experiment recreating Dr. Tomchik's accident: (1) when Lurwig was not qualified to conduct such an experiment; (2) when MetLife failed to demonstrate the conditions of the experiment were substantially similar to the conditions existing at the time of Dr. Tomchik's accident; (3) when MetLife failed to demonstrate that the technique employed by Lurwig had been tested or subjected to peer review; (4) when MetLife failed to discuss any potential rate of error; and (5) when MetLife failed to demonstrate that the technique employed by Lurwig has gained general acceptance in the fields of forensic engineering or accident reconstruction."

According to appellant, Lurwig made several cuts using a band saw at his home in order to compare the kerf marks on his board with those on the board appellant was cutting when he amputated his thumb. Appellant argues that the trial court erred in permitting testimony concerning this out-of-court experiment, and also objects to the photographs and physical evidence, produced during the experiment, which were admitted into evidence.

Appellant argues that Lurwig failed to demonstrate that the experiment was conducted under conditions substantially similar to those existing at the time of appellant's alleged accident, or that the experiment had been subjected to peer review, or was generally accepted in the field of forensic engineering or accident reconstruction. Specifically, appellant notes that the band saw used by Lurwig

had a different horsepower than the saw used by appellant, and that Lurwig admitted to not knowing the amount of force used by appellant in pushing the board through the saw, or the degree to which the wood grain density of the two boards varied.

MetLife responds that the boards offered into evidence through Lurwig's testimony were models, the purpose of which was to assist the jury's understanding. Specifically, the two pieces were introduced to show the difference in kerf marks between a board that is fed through a saw at a normal speed and one that is fed through at a rapid speed. MetLife argues that the boards used were of the same type and dimension as the one appellant had been cutting, and although the two saws were not the exact same model, the blade speed of each was identical. MetLife also notes that the blade used by Lurwig was exactly the same type and size as that used by appellant, and that for purposes of making kerf marks there was no difference between the two.

Moreover, MetLife notes that although the models were constructed under substantially similar conditions, the purpose of the exercise was not to duplicate or reconstruct appellant's alleged accident, but simply to construct a model to assist the jury's comprehension of Lurwig's testimony about kerf marks. In any event, MetLife notes that any dissimilarities between Lurwig's model and appellant's mishap were thoroughly explored during cross-examination, and adequately addressed by the cautionary instruction the trial court gave to the jury.

MetLife's claim that the boards cut by Lurwig were simply demonstrative models is not supported by the record. The testimony on this point is clear:

"Q. [Counsel for MetLife] All right. Now when you made Exhibits 137 and 138, did you attempt to duplicate what he said—or did you duplicate what he said he did in his deposition—

"MR. SCHULMAN: Objection, your Honor.

"Q.—and what he said in court.

"THE COURT: Overruled.

"THE WITNESS: Yes, in terms of the material, and in terms of setting the saw up making the cut around to this point and then pushing it through in a rapid movement as described by Dr. Tomchik, in a slipping fashion."

Lurwig's woodcutting was clearly an attempt to duplicate what appellant claimed had happened, rather than a model to assist the jury's comprehension. As already noted, Evid.R. 702(C) provides:

"To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:

"(1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;

"(2) The design of the procedure, test, or experiment reliably implements the theory;

"(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result."

■ The admission or rejection of evidence concerning out-of-court experiments is a matter peculiarly within the discretion of the trial court, and a reviewing court will not interfere with the trial court's determination absent an abuse of discretion. *Columbus v. Taylor* (1988), 39 Ohio St.3d 162, 165, 529 N.E.2d 1382, 1385–1386. With respect to out-of-court experiments, the Supreme Court of Ohio has previously stated as follows:

"Evidence of experiments performed out of court, tending to prove or disprove a contention in issue, is admissible if there is a substantial similarity between conditions existing when the experiments are made and those existing at the time of the occurrence in dispute; dissimilarities, when not so marked as to confuse and mislead the jury, go to the weight rather than the admissibility of the evidence.

"The admission or rejection of evidence as to such experiments is a matter peculiarly within the discretion of the trial judge, and when such discretion has not been palpably abused reviewing courts will not interfere." *St. Paul Fire & Marine Ins. Co. v. Baltimore & Ohio RR. Co.* (1935), 129 Ohio St. 401, 2 O.O. 396, 195 N.E. 861, paragraphs one and two of the syllabus.

■ Moreover, the conditions under which the experiment was conducted do not need to be identical, but only substantially similar to the conditions at the time of the occurrence in dispute. *Worthington City Schools v. ABCO Insulation* (1992), 84 Ohio App.3d 144, 150, 616 N.E.2d 550, 554. Only in the event that there is no substantial similarity between the conditions should the reviewing court find that the trial court abused its discretion in admitting evidence of an out-of-court experiment. *Id.*

■ Lurwig testified that the wood he used for the experiment was of the same type and dimension as that used by appellant. Lurwig also stated that he had used a Sears Craftsman band saw of the same type as appellant's. Although the exact model numbers were not the same, the saw Lurwig used had the same blade speed as appellant's. Additionally, Lurwig used a one-quarter inch blade, the same as that on appellant's saw. As already noted, Lurwig testified that he attempted to duplicate the cutting operation as described by appellant in his

deposition testimony. Since there was evidence of substantial similarity between the conditions surrounding Lurwig's out-of-court experiment and the conditions surrounding appellant's amputation, the trial court did not abuse its discretion in permitting Lurwig to testify concerning the experiment.

Appellant's second assignment of error is without merit.

Appellant's third and fourth assignments of error, which are argued together, state:

"The trial court abused its discretion in permitting Lurwig to testify as to the results of his out-of-court experiment when the [*sic* ] MetLife did not inform Dr. Tomchik that such an experiment had been performed until after discovery cut-off and in permitting Lurwig to testify regarding his out-of-court experiment where MetLife failed to comply with the requirements of Civ.R. 26(E)(1)(b), but then refused to permit Dr. Tomchik to introduce rebuttal evidence on grounds of untimely expert identification."

"The trial court abused its discretion in permitting witnesses identified by MetLife as lay witnesses to render expert opinions and refusing to permit Dr. Tomchik's lay witness to perform an in-court experiment without testifying."

Appellant's argument is essentially two-fold. First, appellant argues that the trial court erred in permitting Lurwig to testify concerning his out-of-court experiment where MetLife failed to inform appellant of the experiment until after discovery had been closed, and where MetLife failed to comply with Civ.R. 26(E)(1)(b) by informing appellant of the experiment. According to appellant, Lurwig's report, which was sent to appellant five days prior to discovery cut-off, contained no mention of the out-of-court experiment. Appellant claims that he was informed about Lurwig's intent to testify about the experiment only once trial had begun. Appellant argues that the experiment was a matter of substantial importance which required MetLife to disclose it pursuant to Civ.R. 26(E)(1)(b), and that the failure to disclose required exclusion at trial.

MetLife responds by noting that Lurwig's report repeatedly made reference to the model he made and, in fact, included photographs of the boards Lurwig cut using his own saw. In addition, MetLife notes that the report specifically stated that Lurwig had made a model workpiece based on the description contained in appellant's deposition testimony. MetLife argues that if appellant was surprised by the evidence, it could only have been because appellant failed to read Lurwig's report, a contention MetLife claims is supported by the fact that at trial, counsel for appellant was unable to locate his copy of the report. In any event, MetLife notes that even if the report had failed to mention the experiment, the onus was on appellant to conduct discovery upon Lurwig.

Civ.R. 26(E)(1) provides:

"A party is under a duty seasonably to supplement his response with respect to any question directly addressed to (a) the identity and location of persons having knowledge of discoverable matters, and (b) the identity of each person expected to be called as an expert witness at trial and the subject matter on which he is expected to testify."

Although Civ.R. 26(E)(1)(b) requires supplementation of the subject matter on which an expert is expected to testify, it does not require a party to give an opposing party notice of every nuance of an expert's opinion. *Waste Mgt. of Ohio, Inc. v. Mid–America Tire, Inc.* (1996), 113 Ohio App.3d 529, 533, 681 N.E.2d 492, 494–495. Rather, the purpose of the rule is met where, upon the unveiling of a contention, the opposing party is given a reasonable opportunity to prepare to defend against it. *Id.*

Appellant concedes that it received a copy of Lurwig's report prior to the discovery cut-off date. The report states that it is an evaluation based on a review of various materials, and that Lurwig had "examined the cut out workpiece, and made a model workpiece as described by Dr. Tomchik." The report recounts the events in question as described by appellant, and then states that the kerf marks and the straight cut are consistent with force being applied to the workpiece on both sides of the blade and with the workpiece passing through the saw in a smooth, even manner.

The report also states that "[t]here is no evidence of uncontrolled feeding of the workpiece in the area along the cut where Dr. Tomchik claims his injury occurred." According to the report, had the events described by appellant occurred, there would have been tearing of the wood fibers "as shown in figure 4 & 5." Figure 4 is a photograph of a piece of wood described as a "Model workpiece Cut as described by Tomchik testimony," and Figure 5 is the model cut-out piece. The report concludes with Lurwig's opinion that the injury had not occurred as appellant had described it, but, rather, that appellant had placed his thumb in the direct path of the saw blade.

In support of its position that appellee failed to comply with Civ.R. 26(E)(1), appellant cites *Waste Mgt., supra,* wherein an expert witness for the defendant had submitted a report stating that he was unable to come to a conclusion as to the cause of the accident in question. Several days into the trial the witness, apparently for the first time, formed an opinion about what had caused the accident. The plaintiffs sought to exclude the expert's opinion on the ground that they had been unfairly surprised and were unable at that point in the trial to call an expert to rebut the opinion. However, the trial court allowed the expert's testimony.

On appeal, the Court of Appeals for Montgomery County ruled that the expert's "surprise opinion, undisclosed by [the defendant] during discovery and revealed for the first time during trial, created the type of unfair surprise Civ.R. 26(E)(1)(b) is intended to prevent." *Id.,* 113 Ohio App.3d at 534, 681 N.E.2d at 495. Because the plaintiffs could not have been expected to anticipate the expert's testimony, the court ruled that they did not receive a fair opportunity to respond.

In addition, the defendant in *Waste Mgt.* had argued that the plaintiffs were to blame for their surprise at trial because they had failed to depose the witness. In response to this argument, the court stated:

"We are unpersuaded by [defendant's] argument that [the plaintiffs] were at fault for their surprise because they did not depose [the expert]. In light of [the expert's] report stating that he was unable to reach a conclusion about the cause of the accident, [the plaintiffs] could have reasonably decided not to spend time and money deposing [the expert]." *Id.*

In contrast, appellee directs the court's attention to *Tracy v. Merrell Dow Pharmaceuticals, Inc.* (1991), 58 Ohio St.3d 147, 569 N.E.2d 875. In *Tracy,* the plaintiffs complained that the defendant's expert witness had been permitted to testify concerning various matters not revealed in the expert's pretrial report. The Supreme Court of Ohio ruled that although there was some disparity between the expert's report and the expert's trial testimony as to the cause of death, there had been no change in the expert's opinion that the defendant's product was not to blame. Specifically, the court stated:

"Pretrial reports are not intended as a substitute for the taking of depositions. The [plaintiffs], though provided with the summaries and the names of the expert witnesses, chose not to depose those witnesses. While the pretrial reports could have been more complete and while [the expert] did alter his opinion on the precise cause of death (not his opinion that the cause was not [the defendant's product] ), these variances do not render the rulings by the trial judge an abuse of discretion." *Id.* at 153, 569 N.E.2d at 881

In the instant case, although Lurwig's report does not specifically state that an out-of-court experiment was conducted, it is apparent from the photographs and from the statement in the report that Lurwig had made a model work piece, that Lurwig's opinion was based, in part at least, on the results of an experiment regarding kerf marks. In addition, the report makes very clear that it was Lurwig's expert opinion that the amputation of appellant's thumb could not have occurred in the manner described by appellant. At trial, Lurwig did not change his opinion in this regard. The fact that Lurwig conducted an experiment in forming his opinion appears to be a nuance in his opinion, rather than the opinion itself. The report was sufficiently clear to apprise appellant as to Lurwig's

opinion and to present appellant with a reasonable opportunity to prepare a defense against it.

Unlike in *Waste Mgt., supra,* Lurwig's report leaves no doubt as to his opinion regarding appellant's injury. Therefore, *Waste Mgt.* offers no support for appellant's failure to conduct discovery on Lurwig. Appellant's claim of unfair surprise as to one of the ingredients giving rise to Lurwig's opinion has a hollow ring to it. Civ.R. 26(E)(1)(b) does not require a party to provide detailed information concerning the basis for an expert's opinion. Rather, the purpose of discovery is met where, as here, the opposing party is adequately informed as to the subject matter about which the expert is expected to testify.

■ The second argument appellant makes under these two assignments of error is that the trial court erred in refusing to permit appellant to introduce rebuttal evidence on the grounds that he had not timely identified his witness as an expert.

Appellant claims that he twice requested that Lurwig duplicate his out-of-court experiment in front of the jury using the actual saw used by appellant, which request was twice denied. The trial court indicated that appellant would be permitted to demonstrate the operation of the saw during his case-in-chief if he had an expert available, and permitted both sides to submit motions on the issue. Upon hearing the motions, the trial court agreed to permit one of appellant's witnesses, Jack Mihalcak, to run several boards through the saw, but refused to permit Mihalcak to recreate the events of appellant's alleged accident, apparently because Mihalcak had not been previously identified as an expert witness.

Appellant argues that Lurwig's failure to mention his out-of-court experiment in his report made it impossible for appellant to respond with his own expert prior to the discovery cut-off date. In addition, appellant claims that while the trial court refused to permit Mihalcak to rebut Lurwig's testimony by conducting an in-court experiment on the grounds that he had not been timely identified as an expert witness, the trial court repeatedly permitted lay witnesses appearing on behalf of MetLife to render expert opinions over appellant's objection. However, the only example offered by appellant to support this claim is that of Rob Swickard, a certified EMT, who testified concerning the difference between one-percent lidocaine and two-percent lidocaine.

In response, appellee first notes that a trial court has broad discretion as to whether a jury will be permitted to observe an experiment of mechanical devices (citing *Simes v. Dayton–Xenia R. Co.* [1937], 36 N.E.2d 517, 24 Ohio Law Abs. 595), which discretion was not abused in this case where the saw in question was damaged and out of adjustment. Appellee also claims that the trial court did not

find that Mihalcak qualified as an expert and so properly denied appellant's request to perform an in-court experiment.

In addition, MetLife notes that because Mihalcak was not an expert, appellant proposed to have him do the experiments without testifying, which would have precluded MetLife from cross-examining Mihalcak concerning the experiments. MetLife also notes that appellant has failed to show any prejudice, inasmuch as the boards cut by Mihalcak show different kerf markings, depending on the speed of the cut, which is consistent with Lurwig's testimony.

Appellant's claim that Lurwig's failure to mention the out-of-court experiment made it impossible for him to timely retain his own expert witness is unpersuasive. As we have already noted, it was apparent from Lurwig's report that in reaching his opinion, Lurwig had conducted some type of experiment. In addition, the report made clear that Lurwig's expert opinion was that the injury could not have occurred in the manner appellant had described. This clearly placed appellant on notice that in order to counter Lurwig's proposed testimony, appellant would in all likelihood need the services of his own expert witness. Certainly, had appellant deposed Lurwig and inquired further into the basis for his opinion, this possibility would have been readily apparent.

 The admission of demonstrative evidence is generally within the sound discretion of the trial court, in light of all the circumstances in the case. *Tritt v. Judd's Moving & Storage, Inc.* (1990), 62 Ohio App.3d 206, 218, 574 N.E.2d 1178, 1186–1187. Only when the trial court has abused its discretion in the admission or rejection of such evidence will this court reverse the trial court's decision. *Id.* The record indicates that a demonstration of the saw's operation was attempted by Mihalcak, but that the saw was damaged and would not run correctly. In any event, it is clear that the trial court agreed to permit appellant to present a demonstration of the band saw itself, but refused to allow any recreation or duplication of the thumb amputation. We find nothing in the record to suggest this ruling was an abuse of the trial court's discretion.

However, appellant apparently argues that the trial court's decision was pretextual in that the latter consistently allowed lay witnesses called by MetLife to render expert opinions. This claim finds no support in the record. In the only example offered by appellant to substantiate this claim, a certified EMT who testified to having administered thousands of anesthestics, was permitted to testify concerning the difference between one-percent and two-percent lidocaine. Appellant does not specifically argue that this testimony was error, nor do we find error. Suffice it to note that appellant has failed to demonstrate that the trial court's rulings with respect to the parties' respective witnesses were disparate or inconsistent.

Accordingly, appellant's third and fourth assignments of error are without merit.

Appellant's fifth assignment of error states:

"The trial court abused its discretion in permitting MetLife's witness, Dr. Michael S. Wolf, to testify regarding the time in which lidocaine is metabolized when his knowledge was based upon review of three or four medical abstracts which described experiments which were not conducted under conditions substantially similar to those occurring at the time Dr. Tomchik injected his thumb."

During the trial, MetLife called Dr. Wolf, as an expert witness, to testify regarding the time required for the creation of MEGX (monoethylglycinexylidide) from the liver's metabolism of lidocaine. The testimony was sought in order to determine how long prior to the amputation appellant had injected himself with lidocaine, an anesthetic. Investigators for appellee had failed to find MEGX in blood samples retrieved from appellant's band saw. Dr. Wolf testified that detectable metabolism of lidocaine would have occurred in less than fifteen minutes and that, therefore, appellant must have injected himself within fifteen minutes of the amputation.

Appellant argues that the trial court should have excluded this testimony based on the lack of an adequate foundation. Appellant notes that Wolf never conducted any primary research regarding the metabolism time of lidocaine, nor did he communicate with anyone who had done so. Appellant claims that Wolf based his testimony on three or four abstracts of articles that he had not actually read, and that described tests that were performed under conditions very different from those pertaining to appellant's injury.

Specifically, appellant notes that the tests described in the abstracts involved the intravenous and endotracheal administration of lidocaine, whereas appellant had been injected subcutaneously. According to another of MetLife's witnesses, Dr. Michael Howie, a subcutaneous injection results in the slowest absorption rate into the bloodstream, which would delay the detection of MEGX. In addition, Wolf testified that the use of epinephrine would also slow the absorption rate. Appellant notes that it was undisputed that appellant had injected himself with lidocaine and epinephrine prior to the amputation.

In response, MetLife argues that Dr. Wolf's conclusions were not based solely on the research he performed for MetLife, but also on his background, qualifications, and training as a pharmacokineticist. In addition, MetLife argues that any differences between the studies relied on by Dr. Wolf and the conditions surrounding appellant's amputation go to the weight of the evidence, not its admissibility. Finally, MetLife notes that any error must have been harmless as

two other experts offered by it corroborated Wolf's opinions, which testimony appellant has not challenged.

 Appellant does not challenge Dr. Wolf's qualifications as an expert in pharmacokinetics, but rather, appears to claim that Wolf's opinion was unreliable. In determining whether an expert's opinions are reliable, our inquiry focuses on whether the principles and methods the expert employed to reach his opinion are reliable, not whether the conclusions are correct. *Miller v. Bike Athletic Co.* (1998), 80 Ohio St.3d 607, 611, 687 N.E.2d 735. Dr. Wolf testified that he had based his opinion on the blood samples taken by Dr. Lichtenwalner, which had failed to indicate the presence of MEGX. Based on his background and training as a pharmacokineticist, Dr. Wolf opined that MEGX would have shown up in the blood samples within five minutes of the lidocaine injection, and that it would take no more than fifteen minutes. This testimony appears to be based on reliable, scientific information.

 The fact that Wolf did not conduct any primary research concerning the metabolism of lidocaine, or speak with others who had done so, does not render Wolf's opinion unreliable. Rather, this information, which appellant effectively elicited on cross-examination, goes to the weight of the evidence. As Judge McMonagle has previously noted:

"Experts have always been permitted to testify regarding information which forms the basis of their opinions. This has never been limited to 'hands-on' experience, but can include review of applicable treatises, formal classes, discussions with colleagues, personal investigations, reading of books of science, and information gained from other experts in the field." *Steinfurth v. Armstrong World Industries* (C.P.1986), 27 Ohio Misc.2d 21, 22, 27 OBR 206, 208, 500 N.E.2d 409, 411

The same can be said for appellant's claim that the abstracts relied on by Wolf did not discuss the subcutaneous injection of lidocaine with epinephrine. The fact that Wolf relied on these abstracts in forming his opinion speaks to the weight to be given his testimony, not its admissibility. In any event, Wolf testified on cross-examination that the method of infusion, whether intravenal, intramuscular, or subcutaneous, would have no affect on the rate of absorption of the lidocaine, but would merely effect the levels of MEGX detected. Based on his background and experience in biopharmaceutics and pharmacokinetics, Wolf's opinion as to the absorption rate of lidocaine was clearly admissible.

Appellant's fifth assignment of error is without merit.

 Appellant's sixth assignment of error states:

"The trial court abused its discretion in refusing access to relevant and discoverable information contained in the employment file of Patrick Hourihan, MetLife's chief insurance investigator."

Appellant argues that the trial court erred in refusing to allow him to inspect the employment file of Patrick Hourihan, chief insurance investigator for Met-Life. Appellant requested the documents during discovery and MetLife sought a protective order. The trial court granted MetLife's motion in part and denied it in part, ruling that MetLife be required to submit the file for an *in camera* inspection. Subsequently, the trial court granted MetLife's protective order on the grounds that the contents of the file were irrelevant.

Appellant argues that because of the substantial role played by Hourihan in the resulting investigation, his competency and credibility were relevant and important to the case, and had a bearing on the accuracy of the information upon which MetLife denied appellant's claim.

Specifically, appellant notes that the evidence suggests that Hourihan represented to Sherrill Milikin, another witness, that he was investigating appellant as an ATF agent, rather than as an insurance investigator, which appellant alleges was improper. Accordingly, appellant claims that he was entitled to discover whether Hourihan had been disciplined or terminated for dishonesty in the performance of his duties as an investigator.

Appellant also argues that the evidence supports his claim that Hourihan was terminated in order to defeat appellant's attempts to call him as a witness. Finally, appellant notes that in closing argument, counsel for MetLife made reference to Hourihan's absence, arguing that appellant was free to call him if he chose to. Appellant claims that this had the effect of tying his hands, as he could not call Hourihan on account of the trial court's refusal to grant his motion to take Hourihan's deposition.

In response, MetLife notes that although appellant had only eleven days notice that Hourihan would not be called as a witness in the first trial, at the time of the second trial, appellant had known for some ten months that Hourihan would not be appearing, and yet made no effort to retake Hourihan's deposition. MetLife notes that the trial court was required to weigh the need for the discovery request with the harm to privacy interests, and that in so doing the trial court found the evidence irrelevant and protected the strong privacy interest of Hourihan. MetLife argues that the trial court did not abuse its discretion in finding the file irrelevant to the case, noting that the file contains not a single reference to appellant's claim.

In addition, MetLife argues that Hourihan's credibility was not an issue in the case as he did not appear as a witness, and that Evid.R. 607 through 609 limit

evidence of credibility to witnesses only. According to MetLife, the evidence in the case would have remained the same whether or not Hourihan was incompetent, biased, or dishonest, and that appellant's claim that Hourihan was biased against him is irrelevant. With regard to Hourihan misrepresenting himself as an ATF agent, MetLife argues that the witness in question, Milikin, testified that he did not remember the identity of the person who represented that he was an ATF agent, and that the person did not discuss appellant's claim with him. Therefore, MetLife claims that it was unlikely that the alleged ATF agent was Hourihan.

According to Robert McCabe, the Director of Disability Operations for Met-Life, Patrick Hourihan was the field representative assigned to investigate appellant's claim. Hourihan traveled to Columbiana County in March and April 1994 to conduct his investigation, a task that included going to the courthouse to check records, interviewing witnesses, including appellant, taking photographs, examining office records, and ordering an audit of appellant's podiatry practice.

Hourihan was deposed by appellant's original counsel on February 29, 1996. The deposition was filed with the trial court by appellant's replacement counsel. On June 13, 1997, appellant filed a motion to appoint a commissioner to take the deposition of Hourihan in Florida. In the motion, counsel for appellant stated that the additional deposition was necessary as he had assumed that Hourihan would be called to trial, but had just been informed by counsel for MetLife that he would not be. This motion was granted by the trial court the same day.

On June 16, 1997, MetLife filed for a protective order seeking to prohibit the second deposition of Hourihan, arguing that a deposition during the week prior to the trial date would impose an undue burden on the parties involved. That same day the trial court granted MetLife's protective order, prohibiting Hourihan from being deposed again.

Following the hearing, MetLife revealed that Hourihan was no longer employed by them. Subsequently, appellant filed a motion requesting that MetLife produce the personal employment file of Hourihan. On June 23, 1997, the trial court granted the motion in part, ruling that the file be provided to the trial court under seal for *in camera* review. The trial court examined the file and determined that it was not discoverable, as it did not contain relevant evidence. Thereafter, on July 1, 1997, the trial court ordered a mistrial.

During the second and instant trial, appellant renewed his motion to examine the file, arguing that the character and credibility of MetLife's chief investigator was relevant to the case, in view of several alleged irregularities in the investigation. This time the trial court overruled appellant's motion from the bench.

 The trial court has broad discretion in controlling the discovery process. *Huebner v. Miles* (1993), 92 Ohio App.3d 493, 501, 636 N.E.2d 348, 353–354. That discretion encompasses decisions regarding the relevance of information sought during discovery. *Mid–American Natl. Bank & Trust Co. v. Cincinnati Ins. Co.* (1991), 74 Ohio App.3d 481, 491, 599 N.E.2d 699, 705–706. In exercising its discretion, the trial court balances the relevancy of the discovery request, the requesting party's need for discovery, and the hardship upon the party from whom the discovery is requested. *Huebner, supra*, at 501, 636 N.E.2d at 353–354. A decision which, in effect, prevents the requesting party from pursuing discovery will not be reversed on appeal absent a showing of substantial prejudice to that party. *Id.*

We have reviewed the employment file of Hourihan and are satisfied that the trial court did not abuse its discretion. The file does not contain any mention of appellant's claim, nor do any of its contents seem reasonably calculated to lead to admissible evidence concerning the same. Hourihan's termination from employment with MetLife occurred more than two years after his involvement in the investigation into appellant's claim. Although the contents of the file may have been relevant to appellant's counterclaim in bad faith, that counterclaim was not an issue in the instant trial. Therefore, we fail to see how Hourihan's competency and credibility were in issue, especially where Hourihan was not called as a witness by either party.

If appellant was concerned that MetLife had overlooked certain evidence during its investigation, or that the information it relied on was inaccurate, appellant was free to present its own evidence at trial, or could have exposed the alleged inaccuracies through cross-examination. Appellant did not rely on Hourihan to prove its case, nor does anything in the employment file relate to the competency or credibility of any of the witnesses appellant did call. Accordingly, we find no showing of substantial prejudice to appellant by the actions of the trial court in denying him access to Hourihan's employment file.

Appellant's sixth assignment of error is without merit.

 Appellant's seventh assignment of error states as follows:

"The trial court abused its discretion in permitting MetLife to introduce evidence and testimony regarding the settlement amount for medical malpractice actions filed against Dr. Tomchik when said settlements occurred after the amputation of Dr. Tomchik's thumb."

On June 16, 1997, appellant filed a motion *in limine* to exclude all evidence regarding medical malpractice cases filed against appellant after January 16, 1994, the date of the injury. Appellant's argument was that while cases filed prior to the injury might be relevant to show motive, any actions filed after the

injury could not show motive, as they did not precede the event in question. Appellant also argued that the probative value of any such evidence would be substantially outweighed by the danger of unfair prejudice and confusion of the issues.

In response, MetLife argued that the medical malpractice cases were relevant to counter appellant's claim that his practice was thriving, and that he was unconcerned over the claims as his counsel had informed him that they were frivolous. According to MetLife, between June 4, 1993 and September 25, 1995, appellant had been sued for medical malpractice fourteen times. Ten of these cases had been filed in a ten-month period between June 4, 1993 and April 4, 1994. Of these ten cases, MetLife conceded that three had been filed after the injury occurred, but claimed that the three post-injury cases were nonetheless pending during the time it was conducting its investigation. In addition, MetLife claimed that prior to the injury, appellant's lawyers had specifically discussed with him cases that had not yet been filed.

On June 23, 1997, the trial court denied appellant's motion but cautioned both parties to comply with Evid.R. 402 and 403. Following the mistrial, appellant renewed its motion on February 9, 1998. The trial court ruled on the motion on February 23, 1998, in which it stated:

"On February 9, 1998, Defendant filed a 'RENEWAL OF MOTION IN LIMINE TO EXCLUDE TESTIMONY REGARDING MALPRACTICE ACTIONS FILED AFTER DEFENDANT'S INJURY': though this Court notes that on June 23, 1997, it denied said motion indicating it was not a substitute for a [sic] trial evidentiary objections. The Court did indicate to counsel that they should comply with Evidence Rules 402 and 403. This Court notes that it did indicate to counsel that it would likely preclude evidence in Plaintiff's case in chief of 'subsequently filed' malpractice actions unless the Court specifically found them to be relevant. The issue of malpractice actions filed against Defendant could only relate (as to Plaintiff's case in chief) to the Defendant's state of mind at the time of the occurrence which is the subject matter of this lawsuit. And, therefore, the Court indicated it generally would exclude 'subsequently filed' malpractice actions unless they were relevant for some other purpose such as upon cross-examination and/or rebuttal. Counsel are cautioned to avoid dealing with the issue of 'subsequently filed' malpractice actions unless the Court grant [sic] authority to do so. Motion DENIED in part and GRANTED in part."

At trial, appellant called Attorney Douglas Fifner, who represented appellant in some of the medical malpractice cases. Fifner testified that appellant had had minimal involvement in the cases and was apparently unconcerned over them. In addition, in response to a question about whether appellant had any defense in the cases filed prior to the amputation, Fifner stated:

"I think he had a defense in almost all of them. He had—we had obtained expert reviews and had defense expert reviews that the cases were defensible I think in most of them."

On cross-examination, MetLife sought to impeach this testimony through correspondence between Fifner and OUM, appellant's malpractice insurer. Specifically, MetLife elicited statements in the correspondence tending to show that the claims against appellant were valid, and that expert witnesses retained by Fifner were unable to substantiate that appellant had complied with the appropriate standard of care. One of the statements elicited was from a letter dated March 1, 1994, *i.e.*, after the date of the injury, involving the claim of Donald Withers. The trial court overruled appellant's objection to this statement, implying that the statement was permissible to test the credibility of Fifner. In a later clarification to the jury, the trial court stated as follows:

"THE COURT: * * * So the jury has to be careful in evaluating these things that occurred after that date as to whether they would have been in anybody's mind. Now, if they were communicated to the Doctor you have to look for evidence of that type of thing, because there is certain prejudice that can arise. And I will have to ultimately make rulings on these things and I want the jury to understand that after a witness testifies to certain things under direct examination, I have to grant a certain amount of latitude of Counsel to cross-examine that witness.

"So anyway those are the issues and please understand so if we are talking about an issue after the amputation it only relates to issues of credibility as to [*sic.*] witness involved in that aspect alone. At least subject to further rulings of the court."

Thereafter, counsel for MetLife inquired into the settlement position of one of the cases. The exchange was as follows:

"Q. So again this is a case in which January 14th, 1994, you're recommending that OUM continue with settlement negotiations in the Pridon case; right?

"A. Yeah, I don't have the report back from my expert, but this is a potential case, yes.

"Q. It looked to be like a case of liability; correct?

"A. Yeah, and I think I said in the December 20th, letter that it was worth fifteen thousand dollars.

"Q. Well, that's not what OUM ultimately paid is it?

"MR. SCHULMAN: Objection.

"MR. LANZ: Well, your Honor, if this witness is going to—

"THE COURT: Overruled.

"THE WITNESS: Ultimately, I don't believe so.

"Q BY MR. LANZ: And in fact, you already testified you never disagreed with anything OUM ever paid; right?

"A. Right.

"Q. Now, would you turn to Exhibit 64(1)? You see there that OUM ultimately paid a hundred and fifty thousand dollars to settle this claim?

"A. Yes."

Appellant claims that there was nothing entered into on direct examination that would have opened the door to this inadmissible evidence, and that the trial court erred in permitting this testimony. In contrast, MetLife claims that the testimony complained of was introduced to impeach Fifner's direct testimony in which he claimed that in almost all of the cases filed appellant had a defense to the claim. Indeed, MetLife claims the correspondence shows that in six of the seven cases filed, appellant had no reasonable defense, which evidence contradicts Fifner's testimony that the suits were frivolous and of no concern. In addition, MetLife notes that the trial court was careful to limit the jury's use of this evidence by means of curative instructions to the effect that the evidence was to be used only to determine the credibility of Fifner.

During direct examination, counsel for appellant limited his questions to the seven cases filed prior to the date of the injury. Fifner gave an opinion that all of these cases were defensible. Although the correspondence used to impeach Fifner regarding the Withers case was dated sometime after the injury to appellant, the Withers case was one of the cases filed prior to January 16, 1994, and therefore one of those which Fifner believed was defensible.

As for the testimony concerning the amount the Pridon case was settled for, the Pridon case was also one of the initial cases filed prior to the date of the injury. While the testimony does not specifically relate to whether the claim was defensible, the trial court nonetheless made clear through its instructions to the jury, that the evidence was to be used for the limited purpose of determining the credibility of Fifner. Accordingly, we find no error on the part of the trial court.

Appellant's seventh assignment of error is without merit.

■ Appellant's eighth assignment of error states:

"The trial court erred in making intemperate and prejudicial remarks regarding Dr. Tomchik's case in the presence of the jury."

Appellant cites several examples, from both of the trials, of what he claims were intemperate remarks made to appellant's counsel, and assigns this as error.

For example, during the second trial, at one point after the trial court had sustained an objection by appellee, counsel for appellant asked as follows:

"MR. ZIMMERMAN: Okay. Well, I'm not allowed to ask if she would have told him about lidocaine?

"THE COURT: Don't start asking me questions or you're really going to be in trouble."

On another occasion, counsel for appellant missed the court's instruction and asked for guidance. The following transpired:

"MR. ZIMMERMAN: I'm sorry, your Honor. I missed the court's instruction.

"THE COURT: Too bad, too bad.

"MR. ZIMMERMAN: Okay.

"MR. LANZ: I think you need to ask him a different question.

"THE COURT: Ask him a question."

Appellant claims that these and other remarks showed disdain for appellant's counsel and reflected the trial court's poor opinion of appellant's case. As another example of the trial court's bias, appellant points to the following exchange which took place during the re-cross-examination of Randy Hart, the insurance agent who sold appellant his policy:

"Q. All right. Did you bring your appointment book today?

"BY MR. HART: No, I didn't.

"THE COURT: Did you subpoena it, Counselor?

"MR. ZIMMERMAN: No.

"THE COURT: Oh, okay, I just wanted to be sure. Go ahead and ask him a question.

"MR. SCHULMAN: May we approach a moment, please?

"THE COURT: No.

"MR. SCHULMAN: We object, for the record.

"THE COURT: That's fine. I just wanted it clarified.

"MR. SCHULMAN: No, we object, your Honor."

In addition, appellant notes that the trial court practically accused one of appellant's witnesses of being dishonest. The following exchange occurred between the court and Howard Rosen, appellant's financial advisor:

"Q. So these are—

"MR. LANZ: These are—I think maybe we should swear in Mr. Schulman. He's just leading this witness.

"THE COURT: Well, I'm sorry, but we have—you are telling me that his pension disappeared it was gone after he severed his thumb?

"THE WITNESS: No. It was in response to—Mr. Schulman asked me if his pension contribution is gone.

"THE COURT: Oh, okay, then let's say that, please.

"THE WITNESS: I'm sorry.

"THE COURT: I think that it's very misleading to the jury to say his pension is gone and for you to agree with that. If it's not true.

"THE WITNESS: He put it there next to the figure of the pension contribution.

"THE COURT: Well, I don't care where he stands, he's not the witness, you are.

"THE WITNESS: Yes sir."

Appellant argues that accusing a witness of dishonesty on the stand in the presence of the jury is reversible error.

In response, MetLife notes that the trial court has broad discretion to regulate its own courtroom, and that questions posed by a trial judge for purposes of clarification do not constitute improper examination of a witness. MetLife also notes that in determining whether the trial court abused its discretion, a reviewing court must examine the entire transcript, and that isolated examples of bias and prejudice in a lengthy twelve-day trial are not enough to overturn a jury's verdict. In addition, MetLife claims that the instances referred to by appellant do not evidence bias or prejudice, but, rather, when viewed in the overall context, simply demonstrate the trial court responding in a manner so as to appear impartial.

Evid.R. 614(B) permits a trial judge to interrogate a witness as long as the questions are relevant and do not suggest a bias for one side or the other. *State v. Blankenship* (1995), 102 Ohio App.3d 534, 548, 657 N.E.2d 559, 567–568. Absent a showing of bias, prejudice, or prodding of the witness to elicit partisan testimony, it is presumed that the trial court interrogated the witness in an impartial manner in an attempt to ascertain a material fact or develop the truth. *Id.* A trial court's interrogation of a witness is not deemed partial for purposes of Evid.R. 614(B) merely because the evidence elicited during the questioning is potentially damaging to the defendant. *Id.*

In addition, under Evid.R. 611, a trial court has discretion to control the flow of a trial. *State v. Prokos* (1993), 91 Ohio App.3d 39, 44, 631 N.E.2d 684, 687. Since a trial court's powers pursuant to Evid.R. 611 and 614 are within its discretion, a court reviewing a trial court's interrogation of witnesses and comments must determine whether the trial court abused its discretion. *Mentor–on–the–Lake v. Giffin* (1995), 105 Ohio App.3d 441, 448, 664 N.E.2d 557, 561–562.

A review of the entire transcript fails to demonstrate that the trial court abused its discretion under Evid.R. 611 or 614(B). Rather, the trial court's comments and questions demonstrate a reasonable attempt to maintain order in the courtroom and to monitor the presentation of evidence. The isolated examples offered by appellant when viewed in the context of the entire trial fail to demonstrate that the trial court exhibited bias or partiality towards either party.

Accordingly, appellant's eighth assignment of error is without merit.

Appellant's ninth and final assignment of error states:

"The trial court's cumulative errors deprived Dr. Tomchik of his right to a fair trial."

Appellant argues that even if the errors complained of individually do not constitute grounds for reversal, the cumulative weight of them entitles appellant to a new trial. However, having found no merit to any of appellant's assignments of error, this final assignment of error is similarly without merit.

Because we find no merit to any of appellant's nine assignments of error, the judgment of the trial court is hereby affirmed.

*Judgment affirmed.*

Cox and VUKOVICH, JJ., concur.