**VERMEER OF SOUTHERN OHIO, INC., Appellee,**

v.

**ARGO CONSTRUCTION COMPANY, INC., Appellant.**

[Cite as *Vermeer of S. Ohio, Inc. v. Argo Constr. Co.* (2001), 144 Ohio App.3d 271.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–000415.

Decided June 15, 2001.

*Dinsmore & Shohl* and *Timothy S. Mangan,* for appellee.

*John W. Hauck,* for appellant.

---

SHANNON, Judge.

Defendant-appellant Argo Construction Company, Inc. has taken the instant appeal from the entry of judgment for plaintiff-appellee Vermeer of Southern Ohio, Inc., following a bench trial, on Vermeer's complaint for breach of contract and on Argo's counterclaims for breach of express and implied warranties. On appeal, Argo advances four assignments of error.

## I

We address together Argo's first and second assignments of error, in which it challenges the balance struck by the common pleas court in weighing the evidence adduced at trial on Vermeer's breach-of-contract claim and on Argo's breach-of-warranty counterclaims. Neither challenge is meritorious.

Vermeer based its breach-of-contract claim upon an "Equipment Rental Agreement," by which Argo had leased from Vermeer a tub grinder for use in clearing a heavily wooded building site. On September 18, 1997, a Vermeer representative delivered the tub grinder to the building site and spent most of the day instructing Argo employees on how to operate and maintain the tub grinder, including when and how to change its teeth and grease its bearings. Argo's president executed the Equipment Rental Agreement and wrote a check to cover one week's rental after he and his employees had witnessed the tub grinder's capabilities and after he had, in the words of Vermeer's sales representative, "express[ed] satisfaction" with its performance.

The agreement required Argo to "use the equipment in a careful and proper manner"; to "keep the equipment in good repair, appearance, and operating condition, allowing for reasonable wear and tear"; to "pay all expenses of maintaining, replacing, and repairing the equipment * * * and to furnish necessary * * * lubrication to place and maintain it in peak operating condition; and to return the grinder at the end of the lease term in good operating condition, order, repair and appearance * * *, ordinary wear and tear resulting from proper use thereof * * * excepted."

The parties subsequently agreed to extend the lease term for a second week. During the second week, the tub grinder's operator, prompted by the grinder's excessive vibration and its emission of smoke and a high-pitched squeal, shut it down and summoned Vermeer's service personnel. They removed the grinder's hammermill and took it to Vermeer for repair.

Vermeer's service manager, who had supervised the hammermill's repair, testified at trial that "the bearings on both ends of the hammermill [had] completely failed" and that, later, "[a]fter going over the whole machine, [he had found no] evidence [that Argo's employees had] even greased the rest of the machine, let alone the hammermill." He declared that Argo's failure to properly use and maintain the tub grinder had necessitated the substantial repairs for which Vermeer sought by its action to be compensated.

Argo countered Vermeer's allegations with testimony by the employee who had operated the tub grinder and by the employee who had been charged with the responsibility of maintaining it. The tub grinder's operator testified that he had, from the first day, noticed and noted an unusual amount of vibration, but that Vermeer's representatives had failed to offer a satisfactory explanation. Argo's maintenance man conceded that he had not changed the tub grinder's teeth. But each employee insisted that the tub grinder had been "greased on schedule."

In support of its breach-of-warranty counterclaims, Argo presented testimony by its president and its site superintendent. Argo's president testified that his company had had no previous experience with a tub grinder but that he had received verbal assurances by the Vermeer sales representative with whom he had arranged the lease that the tub grinder was in excellent condition and could complete the required grinding in two weeks. The site superintendent testified that he had received the same assurances. And they both asserted that Argo had experienced substantial construction delays and had incurred significant additional expenses as a consequence of the tub grinder's failure to perform as represented.

The Supreme Court of Ohio, in *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus, held that "[j]udgments supported by some competent, credible evidence going to all of the essential

elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." Our review of the record of the proceedings at trial discloses that the trial court had before it competent and credible evidence to support its entry of judgment for Vermeer both on its claim and on Argo's counterclaims. We, therefore, overrule the first and second assignments of error.

## II

We turn next to the challenge presented by Argo in its fourth assignment of error to the trial court's exercise of its discretion in overruling Argo's motion for a new trial. This challenge is equally untenable.

In its post-trial motion, Argo sought a new trial under Civ.R. 59(A)(6) and (A)(7). It subsequently "supplement[ed]" its new-trial motion with its claim that the trial court had, by its remarks and questioning of witnesses and its frequent displays of "impatience" over the course of the trial, exhibited bias against Argo. Argo's challenge on appeal to the denial of its new-trial motion focuses exclusively on this "supplemental" claim.

We note at the outset that Argo's counsel offered no objection at trial to the conduct of which Argo now complains. Ordinarily, an error in the conduct of a trial that was not brought to the attention of the trial court at a time when the error could have been corrected will not provide a basis for reversal on appeal unless it rises to the level of plain error. On appeal from a judgment entered in a civil case, "the plain error doctrine is not favored and may be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." *Goldfuss v. Davidson* (1997), 79 Ohio St.3d 116, 679 N.E.2d 1099, syllabus.

Evid.R. 614(B) permits a trial court to "interrogate witnesses," provided that the court does so "in an impartial manner." Evid.R. 611(A) confers upon a trial court the discretion to "exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, [and] (2) avoid needless consumption of time * * *."

Civ.R. 59(A)(1) permits a court to grant a new trial on the basis of an "abuse of discretion, by which an aggrieved party was prevented from having a fair trial." The disposition of a motion for a new trial based on Civ.R. 59(A)(1) is discretionary with the trial court and will be reversed on appeal only if the record

demonstrates that the court abused its discretion. See *Rohde v. Farmer* (1970), 23 Ohio St.2d 82, 52 O.O.2d 376, 262 N.E.2d 685, paragraph one of the syllabus.

█ The court in the proceedings below frequently and at length interjected itself into the interrogation of witnesses. The court's questions and remarks did not, however, stray from relevant matters, and we perceive nothing in either their tenor or their substance that might suggest that the court was predisposed toward one party or the other. Instead, the court's remarks, questions, and displays of impatience, however officious, appear, when viewed in context, to have been directed toward advancing the goals set forth in Evid.R. 611(A)(1) and 611(A)(2), *i.e.*, to aid the court, sitting as the trier of fact, in "ascertain[ing] * * * the truth" and to speed the process along and thus "avoid needless consumption of time." Finally, even if the court had, in questioning witnesses, strayed from Evid.R. 614(B)'s requirement that a trial court's interrogation be conducted in an impartial manner, we would be hard-pressed to conclude that Argo had been thereby prejudiced, when the purpose of the impartiality requirement is to prevent the trial court from usurping the role of the jury, and the interrogation of witnesses at issue here took place in a trial to the bench.

We thus do not perceive in the trial court's conduct of the proceedings below any abuse of the discretion conferred by Evid.R. 611 and 614. Nor do we perceive any error that might be said to have so affected "the basic fairness, integrity, or public reputation of the judicial process [as to have] challeng[ed] the legitimacy of the underlying judicial process itself." *Goldfuss*, syllabus. We, therefore, hold that the trial court's denial of Argo's motion for a new trial on the ground of judicial bias did not constitute an abuse of discretion. Accordingly, we overrule the fourth assignment of error.

### III

█ In its third assignment of error, Argo contends that the trial court erred in awarding Vermeer attorney fees. We agree.

The "Equipment Rental Agreement" required Argo to pay "all costs and expenses, including * * * reasonable attorneys' fees, incurred by [Vermeer] in * * * enforcing any of the terms, conditions, or provisions" of the agreement. The court below, following the trial and a subsequent hearing on Vermeer's request for attorney fees, awarded Vermeer "$13,635.30 for its costs and attorneys' fees incurred in pursuing [its] claim against Argo."

█ As a general rule, a contractual provision that permits a party to recover its attorney fees as a cost of enforcing the contract is unenforceable as against public policy. See *Miller v. Kyle* (1911), 85 Ohio St. 186, 97 N.E. 372; *State v.*

*Taylor* (1841), 10 Ohio 378, 1841 WL 12. The Supreme Court of Ohio has, however, carved out exceptions to this rule.

In *Worth v. Aetna Cas. & Sur. Co.* (1987), 32 Ohio St.3d 238, 513 N.E.2d 253, syllabus, the court held that "[a]n indemnitor's express agreement to indemnify an indemnitee for the qualified legal expenses incurred is enforceable and is not contrary to Ohio's public policy." And in *Nottingdale Homeowners' Assoc. v. Darby* (1987), 33 Ohio St.3d 32, 514 N.E.2d 702, the court held as follows:

"Provisions contained within a declaration of condominium ownership and/or condominium by-laws requiring that a defaulting unit owner be responsible for the payment of attorney fees incurred by the unit owners' association in either a collection action or a foreclosure action against the defaulting unit owner for unpaid common assessments are enforceable and not void as against public policy so long as the fees awarded are fair, just and reasonable as determined by the trial court upon full consideration of all the circumstances of the case." *Id.*, syllabus.

In exempting such contractual provisions from the general rule, the court in *Nottingdale* characterized as "fundamental" the "right to contract freely with the expectation that the terms of the contract will be enforced" and declared that "[a] rule of law which prevents parties from agreeing to pay the other's attorney fees * * * is outmoded, unjustified and paternalistic." *Id.* at 36, 37, 514 N.E.2d at 705, 707. Nevertheless, the court chose to distinguish on its facts, rather than overrule, its decision in *Miller*, by noting that the "fee-shifting" provision in *Miller* was contained in a promissory note executed in a commercial transaction, whereas the provision contained in the condominium declaration "was assented to in a non-commercial setting by competent parties with equal bargaining position and under neither compulsion nor duress." *Id.* at 35, 514 N.E.2d at 705. Moreover, the court in *Worth* reaffirmed the vitality of the rationale underlying the rule against contractual fee-shifting:

"When a stipulation to pay attorney fees is incorporated into an ordinary contract, lease, note or other debt instrument, it is ordinarily included by the creditor or a similar party to whom the debt is owed and is in the sole interest of such party. In the event of a breach or other default on the underlying obligation, the stipulation to pay attorney fees operates as a penalty to the defaulting party and encourages litigation to establish either a breach of the agreement or a default on the obligation. In those circumstances, the promise to pay counsel fees is not arrived at through free and understanding negotiation." *Id.* at 242–243, 513 N.E.2d at 257–258.

Thus, the general rule against fee-shifting agreements remains, and a court may enforce a party's contractual agreement to pay, as a cost of enforcing the

contract, the attorney fees of the other party only when, upon consideration of the underlying circumstances, the agreement to pay the fees can fairly be said to be the product of a "free and understanding negotiation," *id.* at 243, 513 N.E.2d at 258, between "parties of equal bargaining power and similar sophistication." *Newman v. Salamander Indus. Prods., Inc.* (Apr. 16, 1999), Hamilton App. Nos. C–970811, C–970843, and C–970879, unreported, 1999 WL 218696.

Argo's president testified at trial that his company had never before leased a tub grinder. His testimony did not, however, suggest that he was wholly unfamiliar with equipment leases. Nor does the record otherwise demonstrate that Vermeer operated at some advantage over Argo in terms of relative bargaining power or sophistication in such matters.

On the other hand, the fee-shifting provision at issue here was set forth on the second of the two-page, fill-in-the-blanks "Equipment Rental Agreement" provided by Vermeer. The agreement was presented to and signed by Argo's president on the site on the day the tub grinder was delivered and demonstrated. Contained as it was in the unaltered form agreement provided by the advantaged party, the agreement's fee-shifting provision cannot, without more, be said to have been the product of a "free and understanding negotiation" between Argo and Vermeer. We, therefore, hold that the trial court erred in enforcing the provision by awarding Vermeer the "attorneys' fees incurred in pursuing [its] claim against Argo." Accordingly, we sustain the third assignment of error.

As to our disposition, we note that the trial court awarded Vermeer "$13,635.30 for its *costs and attorneys' fees* incurred in pursuing [its] claim against Argo." (Emphasis added.) Civ.R. 54(D) permits a trial court to award to the prevailing party in a civil action the "costs" of the litigation. Our holding here merely precludes Vermeer from recovering as a "cos[t]" of litigation its attorney fees. Accordingly, we reverse the trial court's $13,635.30 award to Vermeer of the "costs and attorneys' fees incurred in pursuing [its] claim against Argo" and remand this case to the trial court with instructions that it recalculate the amount recoverable as "costs" in a manner consistent with the law and this decision. The balance of the judgment entered below is affirmed.

*Judgment affirmed in part,*
*reversed in part*
*and cause remanded.*

GORMAN, P.J., concurs.

PAINTER, J., concurs separately.

RAYMOND E. SHANNON, J., retired, of the First Appellate District, sitting by assignment.

PAINTER, Judge, concurring separately.

The "attorney's fees" provision was in type this small, on the back of a form. The entire page was covered by dense type, running from the top of the page to the bottom. It was as if the drafter attempted to see just how many words could fit on an 8.5"×11" piece of paper. The answer is 4,385, give or take a few. In contrast, there were 277 words on the original word-processing document of this page, which is the same size.

The sentence containing the attorney-fee language is ninety-six words long, following a 206-word sentence. Sentences of more than twenty words, especially badly constructed sentences, are very difficult to read. The paragraph contains more than 600 words—this paragraph contains forty-two words.

I agree that this provision, hidden in a haystack of legal jargon and gibberish, is unenforceable. No one could be expected to read or understand—much less bargain over—this contractual provision. If boilerplate language is unreadable and indecipherable, it should be unenforceable, especially by the drafter. A long-standing common-law rule may not be thus abrogated.