OPINION
{¶ 1} In this case, Dan D. Weiner, executor of the estate of Sol Weiner, appeals from a jury verdict in favor of Glenn Kwiat, MD. The claims against Dr. Kwiat arose from the death of Sol Weiner (Sol), who was Dr. Kwiat's patient at the time of his death.
 {¶ 2} Mr. Weiner has presented eleven assignments of error in support of the appeal. Rather than list all the assignments of error at this point, we will simply mention each assignment separately during our discussion. For now, we simply indicate that after reviewing the trial record, we find the assignments of error without merit. Accordingly, the trial court judgment will be affirmed. As a point of clarification, we note that the plaintiff (Mr. Dan D. Weiner) is the son of the decedent and is the attorney who tried the case. In addition, Mr. Weiner testified at trial.
 I {¶ 3} Before addressing the first assignment of error, we will briefly outline the course of events that led to the medical malpractice action against Dr. Kwiat. In the fall of 1994, Sol and his wife, Joey moved to Dayton, Ohio, where their sons, Harry and Dan, lived. Before the move, Sol and Joey lived in St. Louis, Missouri.
 {¶ 4} Dr. Kwiat was a family medicine practitioner who had treated members of the Weiner family, including Mr. Dan Weiner and his wife. Consequently, Sol consulted with Dr. Kwiat after moving to Dayton. Sol's first visit with Dr. Kwiat was in December, 1994. At that time, Dr. Kwiat learned that Sol had been hospitalized for depression in March, 1994, in St. Louis. In addition, Sol had various pre-existing physical problems such as cataracts and hypothroidism. Sol also took several medications, including Paxil (an anti-depressant), a thyroid supplement, a blood thinner, and Ativan (a sleeping aid).
 {¶ 5} Additionally, Sol had a history of an elevated P.S.A., which is a blood test that screens for prostate cancer. According to Dr. Kwiat, Sol was not a candidate for prostate removal due to his age (around 88), but could possibly undergo radiation treatment, if prostate cancer were confirmed. After outlining the options, Dr. Kwiat let Sol decide if further action should be taken on the prostate matter. Sol elected to monitor P.S.A. levels, but to do nothing more, at least at that point. Dr. Kwiat also recommended continuing Sol's current medications, except Paxil, which was to be decreased, and eventually eliminated. Additionally, Dr. Kwiat wanted to do blood work in three months, to check on the P.S.A. and thyroid levels.
 {¶ 6} During later visits, Sol mentioned stress and depression. For example, Sol's wife, Joey, was hospitalized in May, 1995, for an episode of catatonic depression. Subsequently, in July, 1995, Sol was having panic attacks, increased anxiety, and stress about money issues with his son and grandson. At that time, Sol was no longer taking either Paxil or Ativan. As a result, Dr. Kwiat prescribed both medicines during a July 25, 1995 office visit. Dr. Kwiat and Sol's wife, Joey, also discussed the most recent P.S.A. test, which showed a P.S.A. level of eleven, as opposed to the previous reading of six. (Four is a normal P.S.A. reading.) However, Sol and Joey still did not want any further prostate treatment or work-up. Dr. Kwiat also discussed the P.S.A. results with Sol's son, Dan, and Dan's wife, Jean.
 {¶ 7} On July 31, 1995, Dr. Kwiat saw Sol again. At that time, Sol's anxiety and depression symptoms had worsened and he was having some suicidal thoughts. Consequently, Dr. Kwiat arranged for a psychiatric consultation with Dr. Balster for August 10, 1995. Before the appointment could take place, Sol was admitted to the psychiatric unit at Kettering Memorial Hospital. After being hospitalized from August 1 to August 11, 1995, Sol was released. He was then readmitted by Dr. Balster on August 21, 1995, for major depression.
 {¶ 8} During Sol's second admission at Kettering, he received an overdose of thyroid medication. Due to problems with urinary retention, Sol also underwent a transurethral resection of the prostate (also known as T.U.R.P), while at Kettering Hospital. Shavings taken during the T.U.R.P. procedure confirmed the presence of prostate cancer. Dr. Kwiat did not take care of Sol during any of the Kettering Hospital admissions, because his medical group had elected not to have medical privileges at Kettering.
 {¶ 9} On September 13, 1995, Sol was discharged from Kettering Hospital to the skilled nursing unit of Lincoln Park Manor Nursing Home. Dr. Kwiat resumed Sol's care, and examined him at around 11:00 p.m. that evening, at the nursing home. Earlier that evening, at around 8:00 p.m., Sol's vital signs included a temperature of 99 degrees, pulse of 114, blood pressure of 160/70, and respiratory rate of 34. The nursing notes indicated Sol was very agitated and anxious. Dr. Kwiat's diagnosis was depression/anxiety, hypothyroidism, hypertension, renal insufficiency, and prostate cancer. The plans at that time were to do a whole body scan for cancer in a few weeks to see if the prostate cancer had spread.
 {¶ 10} Normally, in a skilled care nursing facility, vital signs are taken twice a day, in the morning and in the evening. Doctors visit only about once a month, unless they are alerted to a condition requiring a more frequent visit. On September 15, 1995, the nurse at Lincoln Park (Nurse Edwards) called Dr. Kwiat at around 11:00 a.m., concerning a change in Sol's condition. Sol was complaining of being cold, and nothing they did seemed to warm him up. Sol's temperature was 95 degrees, and the other vital signs included a pulse of 112, respiratory rate of 28, and blood pressure of 102/50. Sol showed increased signs of sweating, requiring changing clothes hourly, and excessive salivation. Dr. Kwiat and Nurse Edwards discussed possible causes, including a thyroid condition related to the excess dosage of thyroid medicine, or an infection. They also discussed anxiety coming into play, based on some of the vital signs Sol had.
 {¶ 11} Nurse Edwards testified that she did not feel that Sol needed to go to the hospital, nor did she tell Dr. Kwiat that Sol should go to the hospital. Based on their discussion, Dr. Kwiat ordered a complete blood count and a thyroid study. The tests were not ordered to be done "stat," which means immediately.
 {¶ 12} Another nurse took Sol's vital signs at around 7 p.m. that evening, which was consistent with practice in the skilled nursing unit. At that time, the vital signs included a temperature of 91.9, pulse of 84, blood pressure of 84/40, and respiratory rate of 28. In addition, Sol was unresponsive. Upon being called, Dr. Kwiat told the nursing home to send Sol to St. Elizabeth Hospital. When Dr. Kwiat arrived at the emergency room of the hospital, Sol was still alive, but was gravely ill. Sol then died the next morning. Dr. Kwiat listed the cause of death as sepsis (or infection), although he was unsure where the infection had originated. No autopsy was performed.
 {¶ 13} The Plaintiff's expert, Dr. Findlay, was critical of the care rendered on the morning of September 15, 1995. Dr. Findlay believed Sol was seriously ill at that time, based on the vital signs and other evidence about his physical condition. Accordingly, Dr. Findlay testified that Dr. Kwiat deviated from the appropriate standard of care by failing to have Sol transferred to an emergency room that morning. Dr. Findlay also indicated that Sol would probably have survived this acute episode if he had been sent to the emergency room and had been properly evaluated at the earliest point, i.e., on the morning of September 15.
 {¶ 14} In contrast, the defense expert (Dr. Webb) found nothing unusual about the vital signs on the morning of September 15. According to Dr. Webb, a reasonable family doctor would not have sent Sol to the emergency room at that time. Dr. Webb also found that all Dr. Kwiat's actions met or exceeded accepted standards of medical care. After hearing the evidence, the jury returned a defense verdict, and this appeal followed. In the first assignment of error, Mr. Weiner contends that "the trial court erred to the substantial prejudice and due process rights of Plaintiff by ruling that questions asked on redirect examination of the Plaintiff's expert were outside the scope of cross-examination."
 {¶ 15} As we mentioned, Dr. Findlay was the Plaintiff's expert. On redirect examination of Dr. Findlay, Mr. Weiner tried to ask two questions, but they were disallowed as being beyond the scope of cross examination. The first question related to Dr. Findlay's experience nine days before the trial with a patient who had sepsis. According to the proffer, Dr. Findlay would have explained "what she did with, uh . . . that particular patient, how a nurse was unable to recognize it. How — but for the fact that she walked in when she did and so forth and caught it and immediately got her up to the, uh . . . I.C.U., uh . . . would establish the timeliness of catching sepsis."
 {¶ 16} Because the trial court has discretion over the control of redirect examination, reversal on that ground can be based on "nothing less than a clear abuse" of discretion. State v. Wilson (1972),30 Ohio St.2d 199, 204. To abuse its discretion, the court must act in a way that is "`"grossly violative of fact and logic so as to demonstrate perversity of will, defiance of judgment, undue passion, or extreme bias."'" Richard v. Wal-Mart Discount Stores (Oct. 8, 1999), Miami App. No. 98 CA 48, 1999 WL 812303, *7 (citations omitted).
 {¶ 17} Generally, redirect examination is intended to "clarify matters raised on cross-examination, not to introduce new evidence."State v. Robie (Mar.11, 1988), Fulton App. No. F-87-3, 1988 WL 30499, *5. In arguing that the proffered evidence related to the cross-examination, Weiner relies on three parts of the transcript where defense counsel allegedly raised a point that would have been rebutted by the proffered testimony. After reviewing the record, we fail to see a correlation.
 {¶ 18} In the first excerpt from the transcript, defense counsel questioned Dr. Findlay about her prior statement (in a report) that "it was difficult to determine the point of no return" in terms of diagnosing Sol's sepsis. On cross-examination, Dr. Findlay said that she still agreed with this statement. Dr. Findlay also agreed that if Sol had been taken to another facility at the earliest possible point, i.e., on the morning of September 15, he would still have had to be appropriately evaluated and treated at that facility in order to survive. In this context, Dr. Findlay further agreed that Sol would not have survived the sepsis if he had been taken to his home that day, as his son, Harry, wanted.
 {¶ 19} In the second excerpt from the transcript, Dr. Findlay was questioned about, and reiterated, her belief that Sol would probably have survived the acute event (the sepsis) if he had been taken to a facility and had been appropriately evaluated at the first opportunity. This is the same subject that was covered in the first excerpt. And finally, in the third excerpt from the transcript, Dr. Findlay was questioned about the basis for her opinion that Sol would have survived the sepsis. In this regard, Findlay indicated that she did not review any textbooks or statistics. Instead, she based the opinion on her education and experience, including teaching at a medical school and seeing patients.
 {¶ 20} If Dr. Findlay had successfully treated a patient with sepsis, that fact could potentially support her opinion as to Sol's survival, assuming that the patient's age and other health circumstances were similar. Since these facts were not proffered, and there was no indication that the circumstances of the two patients were even marginally similar, the relevance of the testimony is hard to assess. More important, however, this was not the point of the testimony. According to the proffer, the testimony would have shown that a nurse was unable to recognize the signs of a particular case of sepsis, and, but for Dr. Findlay's fortuitous appearance on the scene, the sepsis would not have been detected. We fail to see how this testimony is pertinent to the present case.
 {¶ 21} The undisputed evidence at trial was that the accepted standard of care for treating patients in a skilled nursing facility is for doctors to see the patients only once a month, unless a nurse alerts a doctor to the need for a more immediate consultation. However, if a properly trained nurse cannot detect certain potentially life-threatening conditions, this standard of care would be inappropriate for any doctor to follow. Specifically, no doctor could rely on a nurse's report, since the nurse would not be capable of detecting dangerous conditions. In fact, if this standard were followed, Dr. Findlay, herself, would have deviated from the standard of care, i.e., Dr. Findlay was only able to intervene because she happened by chance to see her own patient at a pertinent point.
 {¶ 22} In the present case, Plaintiff did not claim that Dr. Kwiat breached appropriate standards of care by entrusting Sol's care to the nursing home staff, or by relying on the staff to convey information about Sol's condition. Instead, Plaintiff claimed that Dr. Kwiat failed to act promptly when he was told about symptoms indicating that Sol was seriously ill. Accordingly, the trial court did not abuse its discretion by refusing to allow redirect examination on Dr. Findlay's recent experience with a patient who had sepsis.
 {¶ 23} The second area of redirect testimony involved Dr. Findlay's familiarity with things that "are critical in getting an individual with sepsis to the hospital and what they can do to help them survive that event." According to the proffer, this evidence would have shown that Dr. Findlay was "totally familiar with what they do when they get them to the emergency room and the different techniques that are involved in handling infections on an emergency-type basis, uh . . . she would go into detail and explain why that then substantiates her, uh . . . opinion in Court."
 {¶ 24} To support admission of this evidence, Mr. Weiner relies on the same three excerpts that we previously mentioned. In response, Dr. Kwiat contends that this testimony was irrelevant because no one questioned Dr. Findlay's familiarity with sepsis or with what is done to treat patients with sepsis. Dr. Kwiat also claims that if Mr. Weiner wanted to ask these questions, he should have done so during direct examination. We agree that these questions, if relevant, should have been asked during direct examination, where they may have provided background information for the expert's opinion and for the jury.
 {¶ 25} We also agree that Dr. Findlay's expertise with sepsis was not questioned. However, an issue in the case was whether an individual of Sol's advanced age and general physical condition would have survived if he were sent to the hospital at 11:00 a.m. on September 15. The defense expert, Dr. Webb, testified that sepsis is an explosive, overwhelming process that is hard to treat even with a person in the best of health. Therefore, Dr. Webb disagreed with Dr. Findlay about whether 7 or 8 hours delay in treatment would have made a difference. Dr. Webb did not, however, discuss the procedures involved in treating sepsis, and no one suggested that different treatment once Sol arrived at the emergency room would have made a difference. In view of these facts, even if the proffered testimony could have provided background information, it was not critical testimony. As a result, even if we would have allowed the evidence on redirect, the trial court's failure to do so did not cause any harm to Plaintiff. Accordingly, we cannot say that the trial court acted arbitrarily or irrationally in failing to allow redirect examination on Dr. Findlay's expertise with sepsis and what should be done to treat such a condition.
 {¶ 26} Based on the preceding discussion, the first assignment of error is overruled.
 II {¶ 27} In the second assignment of error, Mr. Weiner claims that the trial court "committed error prejudicial to the due process rights of Appellant and abused its discretion by cutting off Plaintiff's cross examination of Defendant's expert, Dr. Webb." The third assignment of error is similar, alleging that "the trial court committed error prejudicial to the due process rights of Appellant and abused its discretion by cutting off Plaintiff's cross examination of Defendant, Dr. Kwiat." Consequently, we will address both assignments of error together.
 {¶ 28} Under Evid.R. 611(A), the trial court must "exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment." In State v. Treesh, 90 Ohio St.3d 460, 2001-Ohio-4, the Ohio Supreme Court indicated that limiting "`cross-examination lies within the sound discretion of the trial court, viewed in relation to the particular facts of the case. Such exercise of discretion will not be disturbed in the absence of a clear showing of an abuse of discretion.'"90 Ohio St.3d at 480, quoting from State v. Acre (1983), 6 Ohio St.3d 140,145. Furthermore, "[t]rial judges may impose reasonable limits on cross-examination based on a variety of concerns, such as harassment, prejudice, confusion of the issues, the witness's safety, repetitive testimony, or marginally relevant interrogation." Id. (citation omitted).
 {¶ 29} Taking Dr. Webb first, the record indicates that the defense direct examination took less than an hour. Mr. Weiner then began cross-examination at 11:16 a.m., and continued until about 12:25 p.m. Our review of the record indicates that Mr. Weiner was ill-prepared, did not know where exhibits were, did not have places marked in depositions that he wanted to ask the witness about, and had difficulty phrasing proper questions. At various points, the court had to tell Mr. Weiner how to properly ask a question. For example, at one point, when Mr. Weiner was unsuccessfully trying to question Dr. Webb about an exhibit, the following exchange occurred:
 {¶ 30} "Judge Schmitt: Counselor . . .
 {¶ 31} "Mr. Weiner: All right.
 {¶ 32} "Judge Schmitt: You hand him the document, first of all, you ask him if he recognizes it.
 {¶ 33} "By Mr. Weiner:
 {¶ 34} "Q: Do you recognize it?
 {¶ 35} "Judge Schmitt: And then you ask him what it is.
 {¶ 36} "The Witness: I — I do.
 {¶ 37} "Judge Schmitt: All right. Now you may proceed."
 {¶ 38} The cross-examination thereafter continued in the same vein, with repetitive, confusing, and improper questions. Finally, the judge told Mr. Weiner that he would have five minutes to complete cross-examination. After about seven or eight more minutes of cross-examination, the court stated that cross-examination would be discontinued. A few minutes before the cross-examination ended, the court had warned Mr. Weiner that his time was running short, and Mr. Weiner responded that he "was going to go through the deposition." However, when the cross-examination was discontinued, Mr. Weiner did not proffer what items he still wanted to ask Dr. Webb about.
 {¶ 39} The other witness in question is Dr. Kwiat, who was first called during the Plaintiff's case. At that time, Mr. Weiner examined Dr. Kwiat, as if on cross-examination, for about 17 minutes, and "passed for the moment." Subsequently, the defense directly examined Dr. Kwiat during its case for approximately two hours (excluding breaks). Mr. Weiner then began his cross-examination at 9:47 a.m. on February 14, 2002. Unfortunately, the same pattern continued as had occurred during Dr. Webb's testimony, with many irrelevant questions. For example, a significant part of the first half hour of examination was spent reviewing various anti-depressant medications that Sol took in 1994 and 1995. Opposing counsel objected because there had been no expert testimony about inappropriate treatment with regard to antidepressants or anti-anxiety medications. The court allowed Mr. Weiner to continue, but cautioned him to zero in on specific issues.
 {¶ 40} Subsequently, Mr. Weiner continued to ask about medications, elicit information that had previously been covered, and ask irrelevant questions. For example, an entire line of questioning about Medicare and Blue Cross billing requirements was struck, after objection, as irrelevant. In discussing Sol's second admission at Kettering in August, 1995, Mr. Weiner asked Dr. Kwiat if he was aware that Sol had been placed on Wellbutrin, and Dr. Kwiat responded that he had not reviewed the record in enough detail to know what medications were used throughout that hospital stay. Notably, Dr. Kwiat was not the primary care physician during the Kettering admission. The following exchange then occurred:
 {¶ 41} "Q: But did you — did you read the records enough to know that he, in effect, uh . . . became — I — I — I call it a nightmare, but you can describe it anyway you want. Have you read `em enough to know . . .
 {¶ 42} "A: Uh . . .
 {¶ 43} "Q: What transpired up there?
 {¶ 44} "A: Yeah, they mentioned he was agitated. I mean he was agitated even when he came in at the beginning of August. But then, they mentioned, you know, at the — on his second admission, that he was agitated. I'm not sure what nightmare . . .
 {¶ 45} "Q: Well, does it indicate, for instance, that he raised his cane and, uh . . . told my mother, uh . . . you put me here and went to hit her and he's never hit her in his life. Does it talk about — I don't want to take the time today to go through all those things . . .
 {¶ 46} "A: Uh . . ."
 {¶ 47} This evidence was completely irrelevant to any point Plaintiff needed to prove, and defense counsel properly objected. After sustaining the objection, the judge said, "Counselor, I"m gonna give you thirty minutes to conclude your Cross Examination of this Witness." The judge then asked the attorneys to approach the bench, at which time the following exchange took place:
 {¶ 48} "Judge Schmitt: Mr. Weiner, you have been asking questions for one hour. Not one of your questions have really been relevant to the issues of this case of this doctor's negligence. Now, I'm gonna give . . .
 {¶ 49} "Mr. Weiner: — (inaudible) —
 {¶ 50} "Judge Schmitt: . . . you — now you hear me out.
 {¶ 51} "Mr. Weiner: All right.
 {¶ 52} "Judge Schmitt: I'm giving you thirty minutes from right now to conclude your Cross Examining. I don't care what you say, you've been asking questions for thirty minutes that are totally irrelevant to the issues in this case. And you're just wasting time.
 {¶ 53} "Mr. Weiner: I'm not . . .
 {¶ 54} "Judge Schmitt: Not one . . .
 {¶ 55} "Mr. Weiner: Your — Your . . .
 {¶ 56} "Judge Schmitt: You — no, I'm giving you — I'm giving you thirty minutes to complete . . .
 {¶ 57} "Mr. Weiner: May . . .
 {¶ 58} "Judge Schmitt: . . . your Cross Examination.
 {¶ 59} "Mr. Weiner: May I respond though?
 {¶ 60} "Judge Schmitt: Okay.
 {¶ 61} "Mr. Weiner: She took . . .
 {¶ 62} "Judge Schmitt: I don't — now . . .
 {¶ 63} "Mr. Weiner: . . . an hour and a half.
 {¶ 64} "Judge Schmitt: I don't care how much time . . .
 {¶ 65} "Mr. Weiner: . . . to have — to have all these things . . .
 {¶ 66} At this point, the judge concluded the sidebar conference and had the jury leave the courtroom. The judge then made the following statement on the record:
 {¶ 67} ". . . let the record reflect that I have chastised, uh . . . Plaintiff's Counsel, Mr. Weiner, for asking questions for an hour in the Courtroom which basically are rambling, they are not relevant to the issues in the case.
 {¶ 68} "We have — we have gotten no where in one hour of questioning of this Witness. I"m putting you on notice right now, Mr. Weiner, that I'm gonna take a five-minute recess, and when we come back, I'm giving you thirty minutes to conclude your examination of this witness.
 {¶ 69} "The fact that the — the — the, uh . . . Defense used two-and-a-half hours does not mean that you get two-and-a-half hours for Cross. If you want to get relevant in your Cross Examination, you do so. But I'm simply not going to allow you two-and-a-half hours to — to (sic) Cross-Examination because the — the Defense took two and a half hours.
 {¶ 70} "You haven't even gotten close to any of the issues related to this case. So I'm giving you thirty and we're taking a recess.
 {¶ 71} "Mr. Weiner: May I be heard?
 {¶ 72} "Judge Schmitt: No, you may not be heard. I'm on the record. I'm stating my . . .
 {¶ 73} "Mr. Weiner: I move for a mistrial here.
 {¶ 74} "Judge Schmitt: Your motion for a mistrial is denied.
 {¶ 75} "Mr. Weiner: All right.
 {¶ 76} "Judge Schmitt: We're on the record, we'll be back in ten minutes and there, the record has been set."
 {¶ 77} After a recess, the jury returned to the courtroom, and the judge then said:
 {¶ 78} "Mr. Weiner, I — I don't want to rush your case, I really don't. I want to give you the opportunity to — to try your case, but I — I — I would hope that we would narrow in on some of the issues that are relevant and — and so, with that in mind, you may proceed."
 {¶ 79} Mr. Weiner then continued his examination for another 47 minutes in the same vein, with few relevant questions. About five minutes before the end of the examination, the court warned Mr. Weiner that he had five minutes left. At that time, Mr. Weiner said he needed additional time, but did not mention or proffer what his intended questions would concern. He also re-crossed the witness for several more minutes after redirect examination, and then "passed" at that point.
 {¶ 80} After the defense rested, Mr. Weiner again moved for a mistrial. However, he did not proffer anything specific that he would have asked, beyond commenting that he was not able to follow through with questioning about Lincoln Park "consecutively or with what those three days (sic) took place."
 {¶ 81} As we mentioned, the trial judge has discretion to control cross-examination. In Farmers Natl. Bank of Springfield v. Frazier
(1920), 13 Ohio App. 245, 1920 WL 524, this court remarked that while a trial court in a proper case may possibly "fix a time limit for cross-examination, * * * we cannot escape the conclusion that cross-examination of a witness is an important right and that subject matter rather than time should constitute the limitation." Id. at 248. Notably, the time limit for cross-examination in Frazier was five or six minutes, which we found "wholly insufficient." Id. In this regard, we stressed that even if the court has discretion to impose a time limit, "it should not be applied as to take away the right of a fair cross-examination." Id.
 {¶ 82} In contrast to Frazier, Plaintiff's counsel in the present case had significant amounts of time for fair cross-examination, but was unable to ask few clear or relevant questions. In similar situations, time limits on cross-examination have been upheld. For example, inWilliamson v. Williamson (Dec. 8, 1998), Franklin App. No. 98AP-213, 1998 WL 869568, the trial court terminated a litigant's questioning of a witness. On appeal, the Tenth District Court of Appeals found no abuse of discretion in view of the many warnings the litigant had received to ask relevant questions. 1998 WL 869568, *3. In this regard, the Tenth District commented that:
 {¶ 83} "[o]n several occasions, the trial court warned appellant to ask questions rather than argue with witnesses or make long commentaries. Several times the trial court instructed appellant as to what constituted a proper area of inquiry, and warned appellant to ask relevant questions. Rather than displaying hostility toward appellant, the trial court was extremely tolerant of appellant and afforded him a considerable amount of leeway and latitude. As stated in the judgment entry and decree of divorce, the guardian was eventually dismissed as a witness `because [appellant] bantered and argued with him for over two (2) hours concerning issues that were not pertinent to [appellant's] companionship rights.' * * * Appellant's cross-examination of the guardian ad litem was finally terminated after appellant had failed `to ask relevant questions after a considerable amount of time and leeway.'" Id.
 {¶ 84} Likewise, in the present case, the trial court cautioned Mr. Weiner on numerous occasions to ask relevant questions. In our view, the court displayed patience in a difficult situation. Accordingly, while time restraints on cross-examination should be the rare exception, we find no abuse of discretion under the facts of this particular case.
 {¶ 85} In Mueller v. Lindes, M.D., Cuyahoga App. No. 80522,2002-Ohio-5465, the Eighth District Court of Appeals also found no abuse of discretion in the limitation of cross-examination of a defense expert in a medical malpractice case. Id. at ¶ 31. The court found that the plaintiff was able to introduce evidence suggesting her theory of the case, and the jury had sufficient evidence to determine if appropriate standards of care were met. Id.
 {¶ 86} These observations are true of the present case, as well. Specifically, Plaintiff's expert testified at length about her medical opinion, and no time restriction on her testimony was imposed. No time limit was imposed, either, on the cross-examination that Mr. Weiner conducted of Dr. Kwiat during Plaintiff's case-in-chief. Accordingly, we believe Plaintiff had adequate opportunity to present his case and the jury had a sufficient basis for making its decision. As a final matter, we note that Mr. Weiner failed to proffer specific questions that he would have asked absent the time limit. Compare Master Vision Polishing,Inc. v. Reliable Castings Corp., Shelby App. No. 17-02-01,2002-Ohio-3390, ¶ 14 (finding no abuse of discretion in time limits on examination of witness where, among other things, appellant did not proffer any specific evidence that would have been submitted).
 {¶ 87} In light of the preceding discussion, the second and third assignments of error are overruled.
 III {¶ 88} In the fourth assignment of error, Mr. Weiner contends that "the actions and comments of the trial judge during the trial proceedings denied Appellant's due process rights to a fair and impartial trial." To support this claim, Mr. Weiner relies on several items, including comments the judge made when limiting the cross-examination of Dr. Kwiat and Dr. Webb.
 {¶ 89} Judicial bias is "`a hostile feeling or spirit of ill will or undue friendship or favoritism toward one of the litigants or his attorney, with the formation of a fixed anticipatory judgment on the part of the judge, as contradistinguished from an open state of mind which will be governed by the law and the facts.'" State v. LaMar,95 Ohio St.3d 181, 189, 2002-Ohio-2128 (citations omitted). Trial judges are
 {¶ 90} "`presumed not to be biased or prejudiced, and the party alleging bias or prejudice must set forth evidence to overcome the presumption of integrity.'" Eller v. Wendy's Internatl., Inc. (2000),142 Ohio App.3d 321, 340 (citations omitted). In Eller, the court also noted that "`[t]he existence of prejudice or bias against a party is a matter that is particularly within the knowledge and reflection of each individual judge and is difficult to question unless the judge specifically verbalizes personal bias or prejudice toward a party.'" Id.
 {¶ 91} Based on our prior discussion, we do not believe the trial judge's remarks about limiting cross-examination indicated hostility or ill will. We do think the trial judge was frustrated with Mr. Weiner's lack of preparation and inability to focus on relevant points. However, we see no bias in how the judge dealt with limiting cross-examination.
 {¶ 92} As other examples of bias or ill will, Mr. Weiner cites comments that the judge made while sustaining an objection during Dr. Kwiat's cross-examination, as well as an inquiry the judge made during the same cross-examination. We have examined the record in these areas and find nothing improper about the judge's actions.
 {¶ 93} In the first situation, Mr. Weiner asked Dr. Kwiat whether as "captain of the ship," the doctor had taken on the responsibility of keeping Sol "healthy, well and alive." Defense counsel objected, and the judge sustained the objection as to some of the characterizations. The judge then told Mr. Weiner that "you can ask him what his duties are as — as the primary physician, I think that's a fair question."
 {¶ 94} We see nothing biased about this response, as trial judges often make similar comments in ruling on objections. Such remarks do not indicate that a prior question was "unfair;" instead, they direct counsel to areas of inquiry that are relevant and appropriate. This is in keeping with the court's duty to control the proceedings.
 {¶ 95} The second situation occurred when the trial judge asked a question during Dr. Kwiat's cross-examination, when no objection was pending. At that point, the judge said: "I think the question is — is — is somewhat misleading, visits versus how many times he has vitals. I mean, visits — I — I don't understand the question. Is it how many times he visited him or how many times did he take vitals, there's — there's a difference here."
 {¶ 96} Our review of the record indicates that the judge was confused about the topic of inquiry, and asked a question for his own clarification. As an initial point, we note that Mr. Weiner did not object at trial to the court's inquiry. Accordingly, we can review this issue only under a plain error analysis. See, e.g., Vermeer of S. Ohio,Inc. v. Argo Constr. Co. (2001), 144 Ohio App.3d 271, 275. The plain error doctrine is used only rarely, in cases involving "`exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself.'" Id. (citation omitted).
 {¶ 97} We see no such circumstances in the present case, particularly since trial judges are specifically allowed, under Evid. R. 614(B) to interrogate witnesses, "as long as the questions are relevant and do not suggest a bias for one side or the other." Metro. Life Ins.Co. v. Tomchik (1999), 134 Ohio App.3d 765, 794. See, also, State v.Davis (1992), 79 Ohio App.3d 450, 454 (trial judge may interrogate witnesses and his or her actions are reviewed for abuse of discretion). Moreover, as we stressed earlier, the trial judge's impartiality is presumed, absent proof of "bias, prejudice, or prodding of the witness to elicit partisan testimony." 134 Ohio App.3d at 794. And finally, the trial court did instruct the jury to disregard anything it may have heard or seen that suggested a particular viewpoint by the court or anyone associated with the court.
 {¶ 98} In Metro Life Ins. Co., the questions of the trial judge were similar to those of the judge in the present case. The Seventh District Court of Appeals found that the questions demonstrated "a reasonable attempt to maintain order in the courtroom and to monitor the presentation of evidence." Id. at 795. In this regard, the Seventh District commented that "[t]he isolated examples offered by appellant when viewed in the context of the entire trial fail to demonstrate that the trial court exhibited bias or partiality towards either party." Id. Likewise, after reviewing the entire record, we find that the trial judge acted reasonably in trying to monitor and control the presentation of evidence.
 {¶ 99} The final issue raised in this context relates to the trial court's failure to sua sponte chastize Dr. Kwiat for his lack of respect in responding to a question posed by Mr. Weiner. In this regard, Mr. Weiner asked the doctor to concentrate on a particular date, and Dr. Kwiat responded:
 {¶ 100} "I'll concentrate on anything you want. You — you put these in front of me and ask me to comment and you haven't been able to ask a question that has been allowed so I can comment on these — so I'm not — I'll concentrate on any date you ask me to concentrate on."
 {¶ 101} After Mr. Weiner objected, the trial court sustained the objection and told the jury to disregard the comment as unresponsive. At that point, Mr. Weiner did not ask the court to do anything else. If a different response or additional instructions were desired, the trial court should have been alerted. Again, the court was simply trying to control the proceedings, and we find no error or bias in the court's failure to admonish Dr. Kwiat.
 {¶ 102} Based on the preceding discussion, the fourth assignment of error is without merit and is overruled.
 IV {¶ 103} Assignments of error five, six, seven, and eight are grouped together in Plaintiff's brief and all pertain to rulings on admission of evidence and exhibits. Accordingly, we will consider those assignments of error together. In order, the assignments of error allege that:
 {¶ 104} The trial court committed prejudicial error and abused its discretion by allowing evidence and testimony that was inadmissible under Evidence Rule 403(A).
 {¶ 105} The trial court committed prejudicial error to the due process rights of the Appellant by overruling parts of Plaintiff's motion to exclude filed on February 11, 2002.
 {¶ 106} The trial court committed error prejudicial to the due process rights of the Appellant by overruling Plaintiff's oral motions made in chambers prior to opening statements.
 {¶ 107} The trial sic [court] committed error prejudicial to the due process rights of Appellant and abused its discretion regarding rulings concerning exhibits offered by Plaintiff and/or Defendant.
 {¶ 108} The particular items of evidence Mr. Weiner challenges are: (1) references in medical records about Sol's wish to die and take poison, and about Sol's attempt to kill himself; (2) testimony about money relatives borrowed from Sol; (3) hospital records other than those from September 3 to 12, 1995; and (4) a note in Dr. Kwiat's records for Monday, May 5, 1997. According to Mr. Weiner, the sole purpose of admitting the evidence was to prejudice the jury against Plaintiff.
 {¶ 109} Trial courts have broad discretion to decide on admission of evidence, so long as their discretion is exercised consistent with the rules of procedure and evidence. Rigby v. Lake Cty. (1991),58 Ohio St.3d 269, 271. We review evidentiary rulings simply for abuse of discretion, meaning we decide if the trial court acted "unreasonably, arbitrarily or unconscionably." Id.
 {¶ 110} Before trial, the court ruled on a motion in limine that Plaintiff had filed. At that time, the court indicated that evidence about depression and suicidal attempts would be properly admitted if Dr. Kwiat indicated that such evidence formed part of his differential diagnosis or was part of the decisions the doctor made. Rulings on motions in limine are preliminary, however, and objections to disputed evidence must still be made at trial. Pena v. Northeast Ohio EmergencyAffiliates, Inc. (1995),108 Ohio App.3d 96, 108.
 {¶ 111} Despite this fact, appropriate objections were not made at trial. In the first place, both sides had already referred to depression during voir dire, prior to the trial court's ruling on the motion inlimine. Importantly, Mr. Weiner did not make objections at various points when witnesses were questioned about Sol's depression and suicidal tendencies. For example, Dr. Kwiat testified during direct examination about Sol's history of depression prior to moving to Dayton. The doctor also mentioned that Sol had reported suicidal thoughts, but not plans, during an office visit of July 31, 1995. In addition, Dr. Kwiat testified that he had received a call from a visiting nurse on August 21, 1995. At that time, Sol had demanded pills to kill himself. No objections were made to any of this testimony. Furthermore, Mr. Weiner, himself, elicited testimony about Sol's depression. Consequently, any alleged error about this point was waived, except for plain error. See, e.g., State v.Jones, 91 Ohio St.3d 335, 343, 2001-Ohio-57.
 {¶ 112} After reviewing the record, we find no plain error. As a preliminary point, there was no error at all, as the depression and suicidal thoughts were relevant to the medical issues. Specifically, both Dr. Webb (the defense expert) and Dr. Kwiat testified that anxiety could have affected Sol's vital signs. Dr. Webb also indicated that information about prior depression and thyroid problems were important in making decisions about medical care. And finally, as the trial judge anticipated in ruling on the motion in limine, the differential diagnosis for Sol included infection, change in the thyroid, anxiety, and being overdressed.
 {¶ 113} Moreover, the nurse at Lincoln Park Manor indicated that because of Sol's recent psychiatric admission, she interpreted some symptoms as behavioral rather than medical, i.e., she felt an episode of apparent unresponsiveness on the afternoon before Sol was admitted to the emergency room was behavorial. Likewise, Dr. Kwiat indicated that his diagnosis when Sol was admitted to the nursing home was depression/anxiety, hypothyroidism, hypertension, prostate cancer, and renal insufficiency. When Dr. Kwiat was called by the nurse about the change in Sol's vital signs, he and the nurse discussed infection, the thyroid condition, and anxiety as possible causes.
 {¶ 114} Even if this were not the case, the depression and suicidal tendencies were pertinent to the value of any claims for loss of consortium. Compare Hampton v. Saint Michael Hosp., Cuyahoga App. No. 81009, 2003-Ohio-1828, ¶ 58 (information in past medical records was relevant and admissible in wrongful death action because decedent's "drinking problem, emotional instability and need for detoxification certainly had an impact on any value the jury might place" on his wife's claim for loss of consortium). As the Hampton court pointed out, the fact that evidence is unfavorable does not mean it is unfair. "`Unfair prejudice is that quality of evidence which might result in an improper basis for a jury decision. Consequently, if the evidence arouses the jury's emotional sympathies, evokes a sense of horror, or appeals to an instinct to punish, the evidence may be unfairly prejudicial. Usually, although not always, unfairly prejudicial evidence appeals to the jury's emotions rather than intellect.'" Id. (citation omitted).
 {¶ 115} After reviewing the records, we do not think the evidence in question was unfairly prejudicial. Instead, the evidence simply offers a truthful view of some aspects of the decedent's life in the months before his death. The jury was entitled to weigh these matters along with any other evidence in deciding the damages, if any, to be awarded for the death.
 {¶ 116} For the same reason, evidence about family conflict was admissible. We do note that very little information about family conflict was contained in the records or testimony. However, to the extent that conflict existed, it was clearly relevant to claims for loss of consortium.
 {¶ 117} The final evidentiary issue involves a reference in Dr. Kwiat's records to a discussion with an attorney who had previously handled the wrongful death case, but later withdrew as counsel. Any references to the attorney were redacted, and the jury saw only this excerpt:
 {¶ 118} "Discussed with her that the presentation was very difficult to sort out in reference to the nursing home personnel. They were faced with a patient who has baseline anxiety with pulse usually around 100 and always complaining of being cold; trying to sort that out from his symptoms on the morning he started having problems. He had slight drop in his BP, but his pulse was around 110 where it had been around 100. He was maybe a little more confused. Also discussed that even [sic] he was in the hospital right at 9:00 a.m. there's a good chance he may not have survived considering his age."
 {¶ 119} We see nothing prejudicial about this excerpt, as it simply recites facts that occurred and opinions that were the subject of trial testimony. Accordingly, since the trial court did not err in admitting any of the challenged evidence, assignments of error five, six, seven, and eight are overruled.
 V {¶ 120} In the ninth assignment of error, Mr. Weiner contends that "questions and actions of the defense counsel constituted misconduct, thereby denying Appellant due process rights to a fair trial." In this regard, Mr. Weiner points to various questions of defense counsel that were allegedly intended to prejudice the jury.
 {¶ 121} "Due process requires fairness and a fair trial." Verbanicv. Verbanic, 70 Ohio St.3d 41, 44, 1994-Ohio-297. Specifically, trial judges have a duty to control trials so that "counsel do not create an atmosphere which is surcharged with passion or prejudice and in which the fair and impartial administration of justice cannot be accomplished."70 Ohio St.3d at 43. Where comments or actions of counsel are "so egregious as to prejudice the jury and prevent a fair trial," the judgment will be reversed. Vescuso v. Lauria (1989), 63 Ohio App.3d 336, 340.
 {¶ 122} In reviewing the record, we did not find evidence of misconduct that prevented a fair trial. The first alleged misconduct occurred when defense counsel questioned Nurse Edwards about Sol pulling a "Joey." This referred to an incident that occurred in the nursing home the afternoon of September 15. Both Sol and his wife, Joey, resided in the nursing home at that point. Joey was in a room across the hall from Sol, was catatonic, and had occasionally exhibited signs of being non-responsive. On the afternoon of September 15, Mr. Weiner reported to Nurse Edwards that his father was not responsive. However, when Nurse Edwards walked over to Sol, he responded to her. Based on the fact that Sol had a psychiatric background and had come from his second psychiatric hospitalization, Nurse Edwards thought Sol was acting out.
 {¶ 123} At this point in Nurse Edwards' testimony, the following exchange occurred between defense counsel and the nurse:
 {¶ 124} "Q: In fact, if I'm quoting you correctly from your deposition, didn't you think that: He was pulling a Joey on us?
 {¶ 125} "A: That's what someone had said to me, yes."
 {¶ 126} Mr. Weiner objected to this testimony as hearsay. However, the trial judge overruled the objection, finding that Mr. Weiner and the nurse were both present and that the nurse was basically discussing her observations of Mr. Weiner and his father. As an initial point, we do not think the testimony was hearsay, because it was not offered to prove that Sol was, in fact, "acting out" as his wife had. Instead, it was offered to show why Nurse Edwards did not attribute significance to the symptom of non-responsiveness and did not alert Dr. Kwiat. In fact, Nurse Edwards said as much in response to further questioning after the objection was overruled.
 {¶ 127} "`Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid. R. 801(C). Thus, the trial court correctly found that the statement was not hearsay. Since the statement was admissible, defense counsel could not have engaged in misconduct by eliciting the information.
 {¶ 128} The second alleged improper comment by defense counsel concerned an addendum Nurse Edwards made to her nursing notes after Sol died. During cross-examination, defense counsel asked Nurse Edwards if she knew of any threatened litigation when she prepared the addendum. An objection to this question was sustained, and the jury was told to disregard the answer or any suggestions about it.
 {¶ 129} The mere fact that an objection to a question is sustained does not mean that opposing counsel committed misconduct in asking the question. Counsel may sincerely have believed the question was proper, or may have asked an appropriate question in an incorrect way. In other situations, the objection may have been improperly sustained, as it was in this instance. Specifically, the trial court erred in sustaining the objection to defense counsel's question, since bias, interest, or motive to misrepresent are proper subjects for impeachment of witnesses. Evid. R. 616(A). See, also, Klar v. Black (Nov. 6, 1996), Summit App. No. 17574, 1996 WL 639976, *5 (evidence that doctor was originally defendant in malpractice action was relevant for purposes of impeachment, as it would have given doctor motive for placing responsibility on other parties). Because Nurse Edwards was offered as a witness by Plaintiff, defense counsel was entitled, on cross-examination, to inquire into Edwards' possible bias, interest, or motive in adding to nursing notes after a patient's death. The next alleged misconduct occurred during cross-examination of Dan David Weiner, who was the decedent's grandson. According to the evidence, Sol had a money dispute with a son and grandson some time before his death. When defense counsel tried to ask this witness about the matter, the trial court refused to allow such questions. However, the court did say that defense counsel could ask Mr. Weiner, the decedent's son, about this issue, when Mr. Weiner was called as a witness.
 {¶ 130} The trial court also erred in this evidentiary ruling, since evidence of conflict over money was potentially relevant to the consortium claims. Hampton, 2003-Ohio-1828, ¶ 58. The error was not harmful to the defense, because the court did allow the same questions to be asked of Mr. Weiner. Obviously, however, defense counsel did not commit misconduct in asking about this point.
 {¶ 131} We would also point out that the transcript excerpt quoted in Plaintiff's brief concerning this issue is taken out of context. According to Plaintiff, the trial judge recognized the money subject as not being "fair game on cross-examination." What the judge actually said, though, was that because the grandson did not testify about his own relationship with Sol, the judge did not know "if that's fair game on Cross-Examination" (referring to the money conflict). After making this remark, the judge asked defense counsel where she was headed with this line of inquiry. When defense counsel explained, the judge said he would not allow the grandson to be bothered by this issue, but would allow questions to be asked of Mr. Weiner. Again, we think the question was appropriate, even for the grandson. Nonetheless, the trial court did not make a generalized statement that the subject matter was not fair game for cross-examination.
 {¶ 132} The final matter of alleged misconduct is defense counsel's cross-examination of Dr. Findlay about an affidavit that was "notarized" over the telephone. The affidavit was then submitted to the trial court as part of Plaintiff's response to a summary judgment motion. In contrast to what actually happened, the affidavit stated that it had been signed in the notary's presence. Subsequently, a properly signed affidavit was substituted for the defective affidavit. According to Mr. Weiner, defense counsel engaged in a "cheap trick" by asking about this point, and implied that the affidavit procedure was underhanded.
 {¶ 133} Mr. Weiner made no objection to any of these questions when they were asked at trial. Accordingly, this issue was waived.Jones, 91 Ohio St.3d 335, 343, 2001-Ohio-57.
 {¶ 134} Later, at the end of his case, Mr. Weiner did move for a mistrial on this issue. During the meantime, however, other witnesses had testified. In a similar situation, we held that the objection was waived and a later motion for mistrial was unseasonable. See Gates v. Dills
(1967), 13 Ohio App.2d 163, 164-165. Although Gates involved an improper reference to insurance, the gist of our remarks in Gates is equally applicable to the present situation. Specifically, we said that "[w]here a party elects to ignore an inadvertent reference to insurance and proceeds at some length with the trial of the case, he must be deemed to have waived any objection to the incompetent evidence." Id. at 165.
 {¶ 135} In overruling Mr. Weiner's motion for mistrial, the trial judge commented that he did not feel the issue was significant. We agree. We also are not convinced that questions on this subject were improper. As we mentioned earlier, opposing counsel is allowed to impeach witnesses on cross-examination by pointing out matters that bear on credibility. Dr. Findlay did allow Plaintiff's counsel to submit an affidavit containing an untrue or incorrect statement. Although Dr. Findlay did so based on Mr. Weiner's assurances (a point that was brought out at trial), the fact is that the affidavit was incorrect. Therefore, this was not an improper subject for inquiry.
 {¶ 136} We also note that the trial court did tell the jury at the end of the case that it should not attach any significance to the way in which the affidavit was notarized. Assuming for the sake of argument that any error occurred, the trial court's instruction was more than adequate to remove any issue concerning what was really a minor point.
 {¶ 137} In any event, the matter does not rise to the level of misconduct and was not "so egregious as to prejudice the jury and prevent a fair trial." Vescuso (1989), 63 Ohio App.3d 336, 340. Accordingly, the ninth assignment of error is without merit and is overruled.
 VI {¶ 138} In the tenth assignment of error, Mr. Weiner claims that "[t]he trial court committed error prejudicial to the due process rights of the Appellant and abused its discretion by denying Plaintiff's motions for a mistrial." The motions in question concern: 1) cross-examination about preparation of Dr. Findlay's affidavit; 2) the trial court's restriction of the cross-examination of Dr. Kwiat; 3) remarks the trial judge made to Mr. Weiner about "narrowing in" on issues that were relevant; and 4) a second motion for mistrial which was made at the end of the case (and was based on limitation of the cross-examination of Dr. Kwiat).
 {¶ 139} Decisions on motions for mistrial are based on the sound discretion of the trial court. As a result, we can substitute our judgment only where the trial court has abused its discretion. Eller v.Wendy's International, Inc. (2000), 142 Ohio App.3d 321, 335.
 {¶ 140} We have already discussed the subjects of the motions for mistrial at length. Because we did not find any reversible error, the trial court did not abuse its discretion in denying the motions for mistrial. Consequently, the tenth assignment of error is without merit and is overruled.
 VII {¶ 141} The final assignment of error challenges the trial court's rejection of Plaintiff's motion to include three depositions as part of the record. According to Mr. Weiner, these depositions were used during the testimony of Dr. Kwiat and Dr. Webb, and are necessary for appeal purposes. However, Mr. Weiner concedes the depositions were not formally made part of the record during trial. In fact, the motion to include the depositions as part of the record was not filed until about two weeks after the trial ended.
 {¶ 142} Civ.R. 32(A) provides that:
 {¶ 143} "Every deposition intended to be presented as evidence must be filed at least one day before the day of trial or hearing unless for good cause shown the court permits a later filing.
 {¶ 144} "At the trial or upon the hearing of a motion or an interlocutory proceeding, any part or all of a deposition, so far as admissible under the rules of evidence applied as though the witness were then present and testifying, may be used against any party who was present or represented at the taking of the deposition or who had reasonable notice thereof, in accordance with any one of the following provisions: (1) Any deposition may be used by any party for the purpose of contradicting or impeaching the testimony of deponent as a witness * * *."
 {¶ 145} The filing requirement is intended "to prevent surprise to the party against whom the deposition is to be used and to place the document with the court prior to the proceedings." Evans v. Smith
(1991), 75 Ohio App.3d 160, 164-65. We review trial court rulings on such matters for abuse of discretion. Armstrong v. Diamond Shamrock Corp.
(1982), 7 Ohio App.3d 296, 301.
 {¶ 146} As we mentioned, Mr. Weiner filed a post-trial motion, asking the court to add these items to the record: (1) Dr. Kwiat's January 28, 1999 deposition; (2) Dr. Kwiat's September 4, 2001 deposition; and (3) Dr. Webb's September 19, 2001 deposition. The motion did not mention good cause; instead, Mr. Weiner simply indicated that the depositions were included in his trial notebook but were inadvertently not marked as exhibits. Defense counsel opposed the motion, pointing out that the exhibits were not offered as evidence, but were used merely for impeachment purposes. In addition, defense counsel indicated that if the depositions had been offered as evidence, she would have opposed their use, since they contained inadmissible evidence. The trial court subsequently overruled the motion because the depositions were not entered into evidence and were not admissible evidence.
 {¶ 147} After reviewing the record, we find no abuse of discretion. In the first place, Dr. Kwiat's January 28, 1999 deposition was already filed as part of Plaintiff's response to a motion for summary judgment. Therefore, that deposition is, in fact, part of the record.
 {¶ 148} As a further matter, Mr. Weiner did not use the September 4, 2001 deposition during cross or re-cross examination of Dr. Kwiat. Specifically, Mr. Weiner referred to Dr. Kwiat's deposition only three times, and all three references were to the January 28, 1999 deposition. Therefore, we see no reason to even consider the potential admission of the September 4, 2001 deposition.
 {¶ 149} The final deposition is Dr. Webb's deposition. During cross-examination, Dr. Webb was asked about a differential diagnosis that had been discussed during Dr. Kwiat's January 28, 1999 deposition. Thus, Dr. Webb was not being asked about his own deposition — he was being questioned about a deposition that we have already said is part of the record. In any event, Mr. Weiner could not find the page where the differential diagnosis was mentioned, and moved on without actually questioning Dr. Webb about the deposition.
 {¶ 150} Mr. Weiner also asked Dr. Webb about a document that was attached to Dr. Webb's own deposition. The document was a "quick review" of Sol Weiner's vital signs, and was something that Dr. Webb had constructed to help him prepare for his deposition. Again, Mr. Weiner did not ask any specific questions about the document itself, and it was never marked as an exhibit.
 {¶ 151} Finally, Mr. Weiner asked Dr. Webb about his use of the term, "fifty/fifty chance of survival." This phrase was allegedly used in Dr. Webb's deposition. However, Dr. Webb testified at trial that he did not use the term "fifty-fifty." Instead, Mr. Weiner had used this phrase while asking questions during the deposition. The deposition excerpt was not read into the record, and the cross-examination of Dr. Webb was stopped shortly thereafter.
 {¶ 152} During direct examination, Dr. Webb stated that the death certificate listed sepsis as the cause of death. He also said he believed sepsis was probably the cause of death, although he was not sure where or how the sepsis originated. Dr. Webb then said he did not agree that Sol Weiner would probably have survived if he were taken to the hospital immediately after Dr. Kwiat's 11:05 a.m. conversation with Nurse Edwards on September 15. The basis for Dr. Webb's opinion was that sepsis is an overwhelming process that is difficult to treat even in persons in the best of health. Accordingly, Dr. Webb felt he would be going "out on a limb" if he said that seven or eight hours would have made a difference to someone in Sol's condition. And finally, Dr. Webb testified that he could not say with a reasonable degree of medical certainty that Sol would have survived if he had gotten to the hospital immediately after Nurse Edwards' call. In contrast, Plaintiff's expert, Dr. Findlay, testified that Sol would probably have survived if he had been taken to the hospital in a timely manner.
 {¶ 153} Assuming for the sake of argument that Dr. Webb said in his deposition that Sol Weiner had a "fifty/fifty" chance of survival, such a statement would be fully consistent with Dr. Webb's direct testimony. Probability "`is defined as `more likely than not' or a greater than fifty percent chance.'" McDermott v. Tweel,151 Ohio App.3d 763, 773, 2003-Ohio-885, ¶ 39 (citations omitted). If Dr. Webb felt that Sol had even a fifty/fifty chance of survival, he would not be able to say, within a reasonable degree of medical probability or certainty, that Sol would have survived if he had been taken to the hospital promptly. Consequently, we see no significance to this deposition testimony.
 {¶ 154} Furthermore, Mr. Weiner has not specifically said in either the motion or his brief, why Dr. Webb's deposition should have been submitted into evidence. And, even if such a suggestion had been made, there was still no showing of "good cause." Civ.R. 32 is very specific about when depositions must be filed — and why. The fact that a party simply neglects to follow a rule does not constitute "good cause." As the Ohio Supreme Court has stressed, "the integrity of procedural rules is dependent upon consistent enforcement because the only fair and reasonable alternative thereto is complete abandonment." Millerv. Lint (1980), 62 Ohio St.2d 209, 215.
 {¶ 155} In light of the foregoing discussion, the eleventh assignment of error is without merit and is overruled.
 {¶ 156} Accordingly, since all eleven assignments of error have been overruled, the judgment of the trial court is affirmed.
GRADY and YOUNG, JJ., concur.