[Cite as *Rush v. Univ. of Cincinnati Physicians, Inc.*, 2016-Ohio-947.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| ANTHONY RUSH, | : | APPEAL NO. C-150309 |
| | | TRIAL NO. A-1202669 |
| and | : | |
| | | *O P I N I O N.* |
| TAMMY RUSH, | : | |
| Plaintiffs-Appellants, | | |
| | : | |
| vs. | | |
| | : | |
| UNIVERSITY OF CINCINNATI | | |
| PHYSICIANS, INC., | : | |
| and | : | |
| THOMAS JOHN KUNKEL, M.D., | : | |
| Defendants-Appellees, | | |
| | : | |
| and | : | |
| WEST CHESTER MEDICAL CENTER, | : | |
| et al., | | |
| Defendants. | : | |

Civil Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal:  March 11, 2016

*Paul W. Flowers Co., Paul W. Flowers, The Becker Law Firm, Michael F. Becker* and *David W. Skall*, for Plaintiffs-Appellants,

*Freund, Freeze & Arnold* and *Mark A. MacDonald*, for Defendants-Appellees.

Please note:  this case has been removed from the accelerated calendar.

**DEWINE, Presiding Judge.**

{¶1}    This is an appeal in a medical-malpractice case.   Anthony Rush sustained injuries when he fell off a ladder at work.   A few days later—while still hospitalized for his injuries—he became paralyzed.    Mr. Rush filed suit, and claims proceeded to trial against Dr. Thomas Kunkel, an anesthesiologist who had treated him, and Dr. Kunkel's employer, University of Cincinnati Physicians, Inc., ("UC Physicians"). The jury returned a defense verdict.  Mr. Rush now appeals.  He argues that the court (1) improperly allowed the defense to offer expert opinions that were not disclosed prior to trial, (2) erred in granting a directed verdict limiting the liability of UC Physicians to the conduct of the named anesthesiologist, and (3) improperly gave a "different methods" jury instruction that was not warranted under the facts of the case.  We find no error and affirm the judgment.

## I.  Background

{¶2}    On November 23, 2010, Mr. Rush fell off a 30-foot ladder while painting a house.  He was taken to West Chester Hospital where he was told he had broken his clavicle and eight ribs on the right side.  At issue in this appeal is the anesthesiology care that Rush received while at the hospital.

{¶3}    Upon Rush's admission to the hospital, an epidural catheter was inserted into his spinal canal for the purpose of administering anesthetic medications.  Over the course of his stay at the hospital, Mr. Rush was treated by several anesthesiologists, all of whom were employees of UC Physicians.

{¶4}    During his first few days in the hospital, Mr. Rush continued to suffer pain that was treated primarily with medications administered via the epidural catheter. Dr. Kunkel saw Rush for the first time on November 26.   Based upon Rush's complaint

of right-sided chest pain, Dr. Kunkel delivered an additional dose of medication. Mr. Rush reported improvement. Because the additional medication had provided relief, Dr. Kunkel increased the epidural infusion rate. Rush's pain diminished, and the next morning, he reported to Dr. Ahmed Khalil that his pain was tolerable.

{¶5} On the evening of November 27, Mr. Rush complained to a nurse of increasing numbness and weakness in his legs and abdomen. The nurse telephoned an anesthesiologist about Rush's worsening condition. The hospital notes do not identify the anesthesiologist with whom she spoke, but the records contain a telephone order from Dr. Kunkel instructing her to decrease the epidural rate. Despite his name on the order, Dr. Kunkel insists that he did not receive this phone call. He testified that he would have followed a different course of action if he had, and that it was common practice for anesthesiologists to routinely sign electronic orders for each other. By his account, it was likely Dr. Khalil who received the call and ordered the decrease, as Dr. Khalil was the anesthesiologist who was "on call" at the time.

{¶6} By early the next morning, Mr. Rush was incontinent of urine and felt numb in both legs. A nurse phoned Dr. Kunkel at 3:50 a.m., and he instructed that the epidural be turned off completely and that the nurse call him back in two hours. At 6:30 a.m., the nurse called back and reported Rush's condition was improving. Another nurse called Dr. Kunkel at 9 a.m. and stated that Rush had increasing sensation in his arms and right leg, but that the numbness persisted in his left leg.

{¶7} But when Dr. Kunkel arrived at hospital at 12:30 p.m., things had taken a turn for the worse. He found Rush could not move his left leg and was very weak in his right leg. Dr. Kunkel ordered an MRI and transferred Rush to University Hospital for evaluation and possible treatment by a neurosurgeon. Mr. Rush did not recover. He is now paralyzed and requires the use of a wheel chair.

{¶8}     Mr. Rush and his wife filed suit against a number of defendants who had been involved in his medical treatment.  Eventually all of the defendants were dismissed except Dr. Kunkel and UC Physicians.  The matter proceeded to a jury trial.  The plaintiffs argued that Rush had become paralyzed as a result of a spinal epidural hematoma.  Under this theory, bleeding from the placement of the epidural had caused compression on the spinal cord that ultimately cut off blood flow to the spinal cord and caused Rush's neurological injuries.  Dr. Kunkel, they argued, was negligent because he had failed to timely identify the hematoma and take corrective action.

{¶9}     The defendants presented a different theory of causation.  Their experts asserted that Rush did not have an epidural hematoma and that there was no compression of the spinal cord. In their view, the original fall caused injuries to the arteries that run along the ribs, and over time, these damaged arteries resulted in reduced blood flow to the spine.  This reduced blood flow caused ischemic injury to the spinal cord, and nothing could reasonably have been done to prevent Rush's paralysis.  Further, they opined that Dr. Kunkel's conduct did not fall below the standard of care.

{¶10}   After the plaintiffs presented their case, the defendants moved for a partial directed verdict, asserting that UC Physicians could not be liable for the conduct of physicians who were not named in the lawsuit.  The court granted the directed verdict, holding that UC Physicians could be held vicariously liable only for the conduct of Dr. Kunkel.  After the close of evidence, the jury returned a verdict in favor of the defendants.

## II. "New" Expert Opinions

{¶11}   In their first assignment of error, the Rushes argue that the trial court abused its discretion when it permitted defendants to introduce new expert opinions that were not disclosed prior to trial.  Specifically, they contend that the court erred in

permitting two defense experts to testify about posterior rib fractures that the experts had not identified prior to trial.

{¶12} At trial, Dr. Thomas Brown testified that on his initial review of Rush's chest x-rays, he had identified a number of rib fractures on Rush's front and side. On subsequent review of his CT scans and MRIs, Dr. Brown also identified a number of posterior rib fractures that he had not observed on his read of the chest x-ray. Dr. Bradford Mullin similarly testified that he identified three fractures on the posterior ribs in his review of Rush's MRI. The posterior ribs, he noted, were in proximity to the artery of Adamkiewicz, a major source of blood to the spinal cord.

{¶13} The plaintiffs objected to this testimony arguing that Drs. Brown and Mullin had not disclosed these rib fractures in their initial reports or at their pretrial depositions. They argued that the posterior rib fractures constituted a new expert opinion that the defense was required to disclose prior to trial. The trial court overruled the objection.

{¶14} Civ.R. 26(B)(5) allows a party to obtain discovery of "facts known or opinions held" by an opposing party's expert that are relevant to the subject matter upon which the expert is to testify. Civ.R. 26(E)(1) requires that a party supplement discovery responses in regard to questions "directly addressed * * * to the subject matter on which [the expert] is expected to testify."

{¶15} We review the court's decision to admit expert testimony under an abuse-of-discretion standard. *Sindel v. Toledo Edison Co.*, 87 Ohio App.3d 525, 529, 622 N.E.2d 706 (3d Dist.1993). The Ohio Supreme Court has found it was an abuse of discretion for a trial court to permit a medical expert to testify about a previously undisclosed causal connection between an injury and a medical problem. *Schumaker v. Oliver B. Cannon & Sons, Inc.*, 28 Ohio St.3d 367, 371, 504 N.E.2d 44 (1986). Civ.R.

5

26(E), however, does not require parties to provide detailed information with regard to the basis for an expert's opinion. *Metro. Life Ins. Co. v. Tomchik*, 134 Ohio App.3d 765, 783, 732 N.E.2d 430 (7th Dist.2000). Instead, the opposing party must be adequately informed as to the subject matter about which the expert intends to testify. *Id.*

{¶16} In this case, Dr. Brown stated in his pretrial report that the damage to the spinal cord was likely caused by "vascular injury to the segmental arteries in the upper thoracic region." He then noted that the right-sided rib fractures displayed on Rush's x-ray demonstrated the severity of the initial traumatic injury. Finally, he concluded that "[d]ecreased blood flow to the cord as a result of the initial trauma ultimately produced [a] spinal cord infarct (a.k.a. "spinal stroke")." The Rushes' attorney asked Dr. Brown several questions in his deposition about literature related to arterial infarct and whether such an injury to Rush's arteries would be visible on the available imaging. The Rushes' counsel did not ask Dr. Brown where Rush's rib fractures were located during the deposition.

{¶17} Dr. Mullin noted in his report that the rib fractures were "correctly positioned to affect the artery of Adamkiewicz." He further explained that the "most definitive MRI reading states that the findings were most consistent with ischemic change and infarct within the distribution of the artery of Adamkiewicz." At his deposition, Dr. Mullin explained that the trauma from the fall caused damage to the vasculature that supplied blood to Rush's spinal cord, resulting in the spinal infarct. The Rushes' counsel did not ask Dr. Mullin where the rib fractures were located during the deposition.

{¶18} Based upon our review of the trial transcript and the discovery proceedings, we conclude that the testimony about posterior rib fractures did not constitute a new "subject matter" of expert testimony that required the defendants to

supplement their discovery responses. *See* Civ.R. 26(E). The theory of the defense experts throughout the case had been that the cause of paralysis was an ischemic injury caused by fractured ribs. Indeed, Dr. Mullin specifically noted in his report that the fractures were positioned to affect blood flow through the artery of Adamkiewicz. It is true that the experts never pinpointed the fractures prior to trial as posterior; but it is also true that the plaintiffs never asked them to pinpoint the fractures.

{¶19} This is not a case like *Schumaker,* 28 Ohio St.3d 367, 504 N.E.2d 44, where the expert presented a completely new and previously undisclosed theory of causation. Nor is it like *Walker v. Holland*, 117 Ohio App.3d 775, 691 N.E.2d 719 (2d Dist.1997), where the expert offered testimony at trial that contradicted what he had said in his deposition.

{¶20} Closer to our case is *Tracy v. Merrell Dow Pharmaceuticals, Inc.*, 58 Ohio St.3d 147, 569 N.E.2d 875 (1991). There, the Ohio Supreme Court held that a trial court did not abuse its discretion in allowing an expert to offer testimony that differed from his previous expert report in the precise cause of death, though not in his opinion that the defendant's product was not responsible. *Id.* at 153. If anything, the discrepancies between what was said at trial and what was disclosed pretrial were much greater in the *Tracy* case than here. *See Faulk v. IBM*, 1st Dist. Hamilton Nos. C-000765 and C-000778, 2001 Ohio App. LEXIS 3980 (Sept. 7, 2001).

{¶21} While the testimony provided at trial was more detailed than that presented in the expert report, we do not find that it constituted a new subject matter of expert testimony. It was not a new theory of causation, and what was presented was consistent with the matters disclosed in discovery. In these circumstances, we cannot conclude that the trial court abused its discretion. The first assignment of error is overruled.

### III. Respondeat Superior

{¶22} In their second assignment of error, the Rushes contend the trial court erred as a matter of law when it granted a directed verdict on all claims against UC Physicians, except for those arising from any negligence committed by Dr. Kunkel. We review a trial court's decision to grant a directed verdict de novo. *White v. Leimbach*, 131 Ohio St.3d 21, 2011-Ohio-6238, 959 N.E.2d 1033, ¶ 22.

{¶23} The court was on solid legal ground in granting a directed verdict. In *Natl. Union Fire Ins. Co. v. Wuerth*, 122 Ohio St.3d 594, 2009-Ohio-3601, 913 N.E.2d 939, paragraph one of the syllabus, the Ohio Supreme Court held that because a law firm does not practice law, it cannot be liable for legal malpractice. Thus, a law firm can only be legally liable for malpractice when one of its principals or associates is liable for malpractice. *Id.* at paragraph two of the syllabus. In reaching its decision, the court found "instructive" its precedent on medical malpractice, explaining that "because only individuals practice medicine, only individuals can commit medical malpractice." *Id.* at ¶ 14, citing *Browning v. Burt*, 66 Ohio St.3d 544, 556, 613 N.E.2d 993 (1993). We have applied *Wuerth* to medical-malpractice claims. *See Henry v. Mandell-Brown*, 1st Dist. Hamilton No. C-090752, 2010-Ohio-3832; *but see Taylor v. Belmont Community Hosp.*, 7th Dist. Belmont No. 09 BE 30, 2010-Ohio-3986. In *Henry*, we concluded that where the claims against a doctor were not filed within the statute-of-limitations period, the plaintiff could not pursue vicarious-liability claims against the doctor's employer. *Henry* at ¶ 14. Thus, under *Wuerth* and our precedent, it is clear that UC Physicians may not be vicariously liable for the conduct of an unnamed physician.

{¶24} Despite this clear authority, the Rushes ask that we carve out an exception for this case. They argue that it is unfair to allow the defendants to point the finger at Dr. Khalil as responsible for the order to which Dr. Kunkel's name was

8

attached, yet allow UC Physicians to avoid liability for any negligence by Dr. Khalil. They contend further that by the time that they discovered that the defendants intended to assert that Dr. Khalil had signed the note, it was too late for them to name Dr. Khalil in their lawsuit.

{¶25}    We are not unmindful of the potential unfairness asserted by the Rushes. *Wuerth*, however, leaves no room for vicarious liability for medical malpractice where a doctor cannot be found to be liable for malpractice.  The Rushes' real complaint is not the theory of vicarious liability adopted by the Supreme Court in *Wuerth*.  Rather, it is the potential unfairness that may be caused where inaccurate hospital records prevent a plaintiff from discovering the identity of a potentially liable defendant until after the limitations period has passed.  But the law in Ohio is clear that once a cognizable event occurs that places a plaintiff on notice that an injury may have resulted from medical treatment, the statute begins to run and the plaintiff has a duty to investigate and identify all potential tortfeasors.  *See Akers v. Alonzo*, 65 Ohio St.3d 422, 425-426, 605 N.E.2d 1 (1992); *Pratt v. Wilson Mem. Hosp.*, 2d Dist. Montgomery No. 18030, 2000 Ohio App. LEXIS 2955 (June 30, 2000).  The Rushes' argument would be better addressed to an extension or tolling of the limitations period than to an expansion of vicarious liability.

{¶26}    The trial court properly granted a directed verdict in favor of UC Physicians other than for the negligence of Dr. Kunkel.  We overrule the assignment of error.

## IV.    Different Methods Instruction

{¶27}    In their third assignment of error, the Rushes argue that the trial court improperly provided the following instruction to the jury:

Although some other physician may have used a different method of treatment—used a method of treatment different from that used by the defendant this circumstance will not by itself prove the defendant was negligent. You shall decide whether the diagnosis and treatment used by the defendant was reasonably prudent in accordance with the standard of care required of an anesthesiologist in his field of practice.

{¶28} The Rushes argue that this "different methods" instruction was inappropriate because the crux of this case pertains to Dr. Kunkel's failure to timely order spinal imaging and diagnose Rush, not whether Dr. Kunkel chose the best treatment option available.

{¶29} The "different methods" instruction is properly given where there is evidence that more than one method of diagnosis or treatment is acceptable for a medical condition. *Pesek v. Univ. Neurologists Assn.*, 87 Ohio St.3d 495, 498, 721 N.E.2d 1011 (2000). The expert witnesses testified that Dr. Kunkel had alternative methods to choose from once Rush reported numbness in his feet and legs. The Rushes' expert testified that when a patient complains of numbness, a CT scan must be conducted immediately. Dr. Kunkel's expert stated the numbness must be addressed, but it is not necessary to rush the patient to a CT or MRI. Instead, he opined, a doctor can cut back on the epidural—or stop it all together—and check the patient's progress after an hour or two. Because evidence was presented that indicated Dr. Kunkel could have utilized different methods and still have acted within the standard of care, the instruction was proper. The third assignment of error is overruled.

### IV. Conclusion

{¶30} The judgment of the trial court is affirmed.

Judgment affirmed.

**MOCK, J.,** concurs.
**STAUTBERG, J.,** concurs separately.

**STAUTBERG, J.,** concurring separately.

{¶31} I concur with the majority opinion, but write separately to discuss the analysis and disposition of appellant's second assignment of error. In it, appellants argue that the trial court should not have granted a directed verdict on all claims against UC Physicians except for those derivative of the claim against Dr. Kunkel. Appellants argue the trial court should have allowed their claims against UC Physicians to proceed notwithstanding the absence of the other possibly culpable physicians as parties. I agree, but am constrained by our previous holding in *Henry v. Mandell-Brown*, 1st Dist. Hamilton No. C-090752, 2010-Ohio-3832, and the doctrine of *stare decisis*, and therefore concur in our outcome.

{¶32} We join the trial court in relying upon *Natl. Union Fire Ins. Co. v. Wuerth*, 122 Ohio St.3d 594, 2009-Ohio-3601, 913 N.E.2d 939, for the proposition that an employer of a physician may not be held liable for the malpractice of its employee-physician on the theory of respondeat superior unless that physician is a named defendant in the lawsuit. I do not agree *Wuerth* should be read so broadly.

{¶33} It is well settled that

[w]here a liability arises against both a master and his servant in favor of a party injured by the sole negligence of the latter while acting for the master, such injured party may sue either the servant, primarily liable, or the master, secondarily liable, or both, in separate actions, as a judgment in his favor against one, until satisfied, is no bar to an action against the other, the injured party being entitled to full satisfaction from either the master or servant or from both.

11

*Losito v. Kruse*, 136 Ohio St. 183, 24 N.E.2d 705 (1940), paragraph two of the syllabus. Not only is *Losito* still good law, it was favorably cited for the same proposition in *Wuerth*. Indeed, other courts have come to the conclusion that *Wuerth* is and should be limited in its application to the particular facts of that case. *See Tisdale v. Toledo Hosp.,* 197 Ohio App.3d 316, 2012-Ohio-1110, 967 N.E.2d 280 (6th Dist.) and *Taylor v. Belmont Community Hosp.,* 7th Dist. Belmont No. 09 BE 30, 2010-Ohio-3986. These cases conflict with our analysis and outcome.

{¶34} Here, UC Physicians was sued as the employer of providers of medical care to Mr. Rush before the expiration of the statute of limitations. In my view, *Wuerth* should not apply to preclude any claim for vicarious liability flowing from the alleged malpractice of physicians not named as parties in the lawsuit. Indeed, in *State ex rel. Sawicki v. Lucas Cty. Court of Common Pleas*, 126 Ohio St.3d 198, 2010-Ohio-3299, 931 N.E.2d 1082, the Supreme Court passed on an opportunity to expand or even mention *Wuerth.* Rather, the court there reiterated the employer can still be held vicariously liable for the negligence of a statutorily-immune, and dismissed, physician.

{¶35} Nevertheless, in *Henry v. Mandell-Brown*, 1st Dist. Hamilton No. C-090752, 2010-Ohio-3832, we applied *Wuerth* to medical malpractice claims and prohibited a claim against the employer where the physician was not named in a lawsuit until after the statute of limitations had run. We are bound by the doctrine of *stare decisis* to follow that application unless and until the Supreme Court resolves the differing interpretation of *Wuerth* in this area of the law.

Please note:

The court has recorded its own entry on the date of the release of this opinion.